787 So.2d 747 (2001)
Jason Demetrius STEPHENS, Appellant,
v.
STATE of Florida, Appellee.
No. SC92987.
Supreme Court of Florida.
March 15, 2001.
Rehearing Denied June 4, 2001.
*750 Michael R. Yokan, Jacksonville, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Jason Demetrius Stephens. Stephens was charged with one count of first-degree murder, one count of armed kidnapping, six counts of armed robbery, two counts of attempted armed robbery, one count of burglary, and one count of aggravated battery. He pled guilty to the armed kidnapping of Robert Sparrow, III, armed robbery of Robert Sparrow, Jr., armed robbery of Derrick Dixon, armed robbery of Roderic Gardner, attempted robbery of Tammy Cobb, attempted robbery of David Cobb, armed burglary and aggravated battery. The jury found Stephens guilty of the first-degree murder of Robert Sparrow, III and armed robbery of Kahari Graham. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the judgment and sentence of death.
The overwhelming evidence of guilt in this case shows Stephens broke into Robert Sparrow, Jr.'s house on June 2, 1997, at approximately 2 p.m., while a number of people were present. He robbed the people there and kidnapped a child. There were three or four other people with Stephens at the time he committed these crimes. However, Stephens refused to cooperate with the authorities in their efforts to identify the other individuals. One of the individuals, Horace Cummings (Cummings), turned himself into the police and was tried with Stephens. The other two individuals were never apprehended. Stephens testified at trial that Cummings and the other unidentified individuals went to the house to buy drugs and were unaware of his plan to rob the occupants.
There were eight eyewitnesses in the house who testified at trial.[1] While some of the details of the eyewitness' accounts varied, they all substantially agreed with the following summary of events. Stephens entered the house first, carrying a nine millimeter automatic gun. He was standing *751 next to Robert Sparrow, III (Sparrow III), who was three years and four months old. Upon seeing the gun, the child's mother, Consuelo Brown, physically confronted Stephens. Stephens hit her with the gun on the bridge of her nose. Ms. Brown fell to the ground and her nose began to bleed. Stephens ejected a bullet onto the floor and informed the occupants that the gun was loaded. He told them that he wanted "money and weed." He demanded from Robert Sparrow, Jr. (Sparrow Jr.) the keys to a blue car located outside the house. Sparrow Jr. told Stephens the keys were with someone who was not present at the house.
Thereafter, two other individuals entered the house. One of the individuals was Cummings, but the other individual was never identified. Stephens made all the occupants lie down on the floor as he searched their pockets for valuables. The unidentified individual, referred to as Plats or Dreds because of the way he wore his hair, held the occupants of the house on the floor at gunpoint while Stephens located a secured room where he could put them. There was some testimony that Sparrow III said he was being choked, but it was unclear from the record who was choking him. After inspecting the house, Stephens determined the bathroom was the most secure location to put his hostages, and he ordered six of them, including six-year-old Kahari Graham, to crawl to the bathroom. Sparrow III was kept separate from the others.
Many of the eyewitnesses testified that Stephens showed his ID and said he was taking Sparrow III with him as insurance. Sparrow Jr. testified Stephens agreed he would leave the child at the corner if he was not followed. Stephens also testified he agreed to leave the child somewhere, but he did not know what location the child's father had referred to in his testimony.
After the occupants had been secured in the bathroom, Sparrow Jr.'s half-brother, David Cobb (Cobb), and his friend, Roderick Gardner (Gardner), arrived at the house. Upon entry, they too were robbed and forced to crawl to the bathroom. One of the items Stephens took from Gardner was his car keys. Gardner was driving his mother's dark green Kia, which had rolldown windows and pull-up locks. There was testimony that Sparrow III had ridden in the Kia the day before he was killed. On that day, he had been scolded for rolling down the windows and trying to open the car door while it was moving. The record did not reflect that Stephens had any way of knowing whether the child was capable of rolling down the windows or opening the car door.
When Stephens exited the house with the child, the other individuals who Stephens testified had only gone to the house to buy drugs, were seated in the black car they had driven to the scene. Stephens testified the other individuals waved him away from the black car because he had the child. Stephens then ordered the boy to get into the Kia. Both cars pulled away from the house, with the Kia following the black car. After driving eight tenths of a mile, both cars pulled over in a residential neighborhood. It was approximately 2:30 p.m. The Kia was parked on the side of the street without the benefit of any shade. The outside temperature was approximately 82 degrees and sunny. The windows in the car were rolled up and all of the doors were closed. At 9:25 p.m., the dark green Kia was found. Sparrow III was dead, his body lying face down in the passenger's seat with his feet angled toward the steering wheel. The State argued Stephens suffocated Sparrow III before leaving the *752 car. Stephens testified the boy was alive when he left him in the car.
The medical examiner, Bonifacio Floro, M.D., testified that in his expert medical opinion Robert Sparrow, III had probably died of asphyxiation.[2] However, he could not conclusively rule out hyperthermia as the cause of death. He primarily relied upon multiple "petechiae"[3] in the face and eye lining as an indication of asphyxiation. He also noted there was a small four-millimeter scratch on the back of the child's neck. Dr. Floro concluded this scratch was probably caused by a fingernail. Dr. Floro testified the child's lower lip was bruised, indicating he had been suffocated. Dr. Floro also relied upon the lack of fingerprints or other evidence showing the child tried to roll down the window or open the door in concluding it was more likely that Sparrow III died from asphyxiation than hyperthermia.
Steven Frank Dunton, M.D., testified on the defendant's behalf. After reviewing Dr. Floro's report, he concluded Sparrow III died from hyperthermia. Dr. Dunton relied upon the fact that there were very few signs of asphyxiation. However, he did admit asphyxiation can never be conclusively ruled out because it can leave no signs at autopsy. Dr. Dunton admitted hyperthermia by itself should not cause petechiae, whereas asphyxiation could. However, he went on to explain that gravity will pull the blood down to the lowest point of the body when the heart stops pumping, causing the blood to pool to such a degree that venules rupture resulting in petechiae. He attributed the discoloration of the child's lips to the tissues drying out after death. Therefore, he concluded Dr. Floro erred in relying on the petechiae to diagnose the child's death as being caused by asphyxiation.
Based upon these facts the jury concluded Stephens was guilty of first-degree murder. The verdict form did not delineate between first-degree premeditated murder and first-degree felony murder.
During the penalty phase the state offered victim impact testimony and evidence of a prior violent felony against a sixteen-year-old girl. Stephens offered mitigating testimony that he was good with children, had been raised in a good Catholic family, had an ability to work with his hands to build things, had been deeply effected by his father's death, was remorseful for Sparrow III's death, and was religious. The jury recommended death by a nine to three vote. The trial court followed the jury's recommendation and sentenced the defendant to death for the first-degree murder charge.[4] Stephens was also sentenced to life imprisonment for armed kidnapping with the sentence to *753 run consecutive to the murder sentence. He was sentenced to concurrent life terms for the six armed robberies with these sentences to run consecutive to the murder and armed kidnapping sentences.
Stephens raises the following eleven points on this appeal: (1) the trial court erred in denying a motion for judgment of acquittal; (2) the trial court erred in denying motion for new trial; (3) the trial court erred in denying a motion to withdraw the robbery plea involving the robbery of Derrick Dixon or erred in failing to reduce the charge to attempted armed robbery; (4) the trial court erred in denying the defendant's special instruction on his theory of defense; (5) the trial court erred in denying the defendant's motion for a change of venue; (6) the trial court erred in failing to conduct a Nelson inquiry; (7) the trial court erred in allowing the prosecutor to question the defendant concerning a statement about the electric chair; (8) the defendant's sentence is unlawful under Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); (9) the trial court erred in its assessment of aggravating and mitigating factors; (10) the trial court erred in failing to declare section 922.10, Florida Statutes (1997), unconstitutional; and (11) the trial court erred in failing to declare section 921.141, Florida Statutes (1997), unconstitutional. After carefully reviewing the record in this case, we affirm Stephens' convictions and sentences.

Denial of Judgment of Acquittal
Stephens first argues the trial court erred in failing to grant his motion for judgment of acquittal on the charge of first-degree murder. This claim is both unpreserved for appeal and without merit. This claim was not preserved for appeal because Stephens' counsel made a bare bones motion for judgment of acquittal, without any specific argument. In Woods v. State, 733 So.2d 980 (Fla.1999), this Court held the claim of improper denial of a motion for judgment of acquittal had not been preserved for appeal by a boilerplate motion without specific grounds. We said:
To preserve an argument for appeal, it must be asserted as the legal ground for the objection, exception, or motion below. See Archer v. State, 613 So.2d 446, 448 (Fla.1993); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). Florida Rule of Criminal Procedure 3.380 requires that a motion for judgment of acquittal "fully set forth the grounds on which it is based." See Fla.R.Crim.Pro. 3.380(b) (emphasis added). Here, Woods submitted a boilerplate motion for acquittal without fully setting forth the specific grounds upon which the motion was based. He did not bring to the attention of the trial court any of the specific grounds he now urges this Court to consider.
Id. at 984. See also Geralds v. State, 674 So.2d 96 (Fla.1996) (holding two claims of unconstitutionality of jury instructions pertaining to death penalty proceedings procedurally barred because counsel failed to object with specificity); Marquard v. State, 641 So.2d 54 (Fla.1994) (finding a particular argument not preserved as to the trial court's denial of motion for judgment of acquittal on murder charge); Patterson v. State, 391 So.2d 344 (Fla. 5th DCA 1980) (holding a bare bones motion for directed verdict will not permit a defendant to raise every possible claimed insufficiency in the evidence); De La Cova v. State, 355 So.2d 1227 (Fla. 3d DCA 1978) (finding a bare bones motion for directed verdict does not raise every possible claimed insufficiency in the evidence). Furthermore, there is sufficient evidence to support Stephens' conviction for first-degree felony murder. In Woods, we reaffirmed the general rule established in Lynch v. State, 293 So.2d 44, 45 (Fla.1974), *754 that "courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." See also Gudinas v. State, 693 So.2d 953 (Fla.1997); Barwick v. State, 660 So.2d 685 (Fla.1995); DeAngelo v. State, 616 So.2d 440 (Fla.1993); Taylor v. State, 583 So.2d 323 (Fla.1991).
Moreover, the evidence in this case supports a finding that the murder was committed during the course of a felony. Stephens entered a plea of guilty to the charge of armed kidnapping. The only question, therefore, is whether the kidnapping had ended prior to the death of the victim. The victim of the kidnapping was Sparrow III, a three-year old child. Stephens took the child from the house where the robberies occurred after the other occupants were herded to the bathroom. He put the child in the dark green Kia and drove to a location that was not communicated to anyone. Prior to leaving the house, Stephens indicated he would leave the child at the corner if he was not followed. The Kia was left parked on the sunny side of a street with the doors closed and the windows up. The car was not located for approximately seven hours after it was driven from the scene of the other crimes.
This was a three-year old child who was left in an automobile with the windows and doors closed. Earlier, the child had observed his kidnapper as he brandished a gun and threatened the other members of the household. Under these circumstances it cannot be said that the kidnapping had ceased prior to the child's death since the child, based on his age and the totality of the circumstances, was never at a place of safety before he died. Cf. State v. Stouffer, 352 Md. 97, 721 A.2d 207 (1998) (finding a continuing kidnapping where the victim's liberty was never restored prior to his death).
Because the death occurred during the commission of the kidnapping, there is competent substantial evidence to support a conviction for first-degree felony murder.

Denial of Motion for New Trial
Next, Stephens argues the trial court improperly denied his motion for a new trial because the manifest weight of the evidence did not support the verdict. This issue has not been properly preserved for appeal because Stephens' counsel made a bare bones motion for a new trial. Such motions are not sufficient to preserve any specific argument for appellate review. See Woods, 733 So.2d at 984; see also Geralds, 674 So.2d at 98-99; Marquard, 641 So.2d at 58; Patterson, 391 So.2d at 345; De La Cova, 355 So.2d at 1230. Moreover, even if this issue had been preserved for appeal, we would find no error because the claim is without merit. A trial court's denial of a motion for a new trial is reviewed under an abuse of discretion standard. In order to demonstrate abuse, the nonprevailing party must establish that no reasonable person would take the view adopted by the trial court. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980). That standard has not been met in this instance. The manifest weight of the evidence proves, at a minimum, that Stephens committed felony murder. Accordingly, we find this argument to be without merit.

Reduction of Armed Robbery Plea
Stephens pled guilty to armed robbery of Derrick Dixon. At trial Derrick Dixon testified that Stephens searched his pockets but nothing was taken from him. Based on this testimony, Stephens argues the trial court erred in denying his motion to withdraw his guilty plea and amend the charge to attempted armed robbery. The *755 motion to withdraw the plea[5] was made at the close of the State's case. Because Stephens was not on trial for this robbery, the trial judge indicated withdrawal of the plea could not be addressed at that point in time. Thereafter, during the defendant's case, Stephens testified to the following facts concerning the robbery of Dixon:
A ... Derrick Dixon gave me $20 in denominations of two tens.
Q Now, you heard Derrick Dixon testify that nothing was taken from him?
A (laughing)
Q But you took money from him, too, didn't you?
A Yes, I did.
Stephens thereafter used the fact that he had entered pleas to convince the jury that he admitted all of the crimes he committed and that he only denied those he did not commit.
Additionally, during the jury instruction conference, the trial court noted the fact that a judgment of acquittal had been granted the codefendant on the armed robbery charge and indicated that Stephens' counsel would be filing a motion to withdraw his plea on that particular count. No further motion on this issue was ever made by the defense. Since no further motion was made, the trial court did not err in failing to rule on the "nonexistent" motion to withdraw the plea. Contrary to Stephens' assertion, the trial court in this instance did not deny a motion to withdraw plea; he simply told the defendant to file his motion at a more appropriate time.

Denial of Theory of Defense Instructions
Stephens urges reversal of his murder conviction, alleging the trial court erred in denying his request for several special jury instructions concerning his theory of defense.[6] While a defendant is entitled to have the jury instructed on his theory of defense, the failure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards. See Palmes v. State, 397 So.2d 648 (Fla.1981). The trial court in the instant case gave the standard jury instructions for first-degree felony murder. The standard jury instructions are presumed correct and are preferred over special instructions. See State v. Bryan, 290 So.2d 482 (Fla.1974). Thus, Stephens has the burden of demonstrating that the trial court abused its discretion in giving standard *756 instructions. See Phillips v. State, 476 So.2d 194 (Fla.1985); Williams v. State, 437 So.2d 133 (Fla.1983).
The jury was instructed as follows on the issue of first-degree felony murder:
Before you can find the defendant guilty of first degree felony murder, the State must prove the following three elements beyond a reasonable doubt:
1. Robert Sparrow, III is dead.
2. (a) The death occurred as a consequence of and while the defendant was engaged in the commission of a kidnapping, or a robbery, or a burglary; or
(b) The death occurred as a consequence of and while the defendant was attempting to commit a kidnapping, or a robbery, or a burglary; or
(c) The death occurred as a consequence of and while the defendant was escaping from the immediate scene of a kidnapping, or a robbery, or a burglary.
3. (a) The defendant was the person who actually killed Robert Sparrow, III; or
(b) Robert Sparrow, III was killed by a person other than the defendant, but both the defendant and the person who killed Robert Sparrow, III were principals in the commission of an attempt to commit kidnapping, or robbery, or burglary.
In order to convict of first degree felony murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill.
The elements of kidnapping, attempted kidnapping, robbery, attempted robbery, burglary, and attempted burglary will be explained to you when I read pages 11 and 12 of these instructions.
Thereafter, the trial court instructed the jury on the elements of kidnapping, robbery, burglary, and attempts to commit these offenses. These instructions informed the jury that a conviction for felony murder could only be supported if the death occurred as a consequence and while the defendant was committing or attempting to commit one of the named felonies.
In order to be entitled to a special jury instruction, Stephens must prove: (1) the special instruction was supported by the evidence;[7] (2) the standard instruction did not adequately cover the theory of defense;[8] and (3) the special instruction was a correct statement of the law and not misleading or confusing.[9] The trial court did not err in denying these special instructions because Stephens failed to prove the instructions given did not adequately cover his theory of defense or that the special instructions were a proper statement of the law that would not mislead and confuse the jury. See Parker v. State, 641 So.2d 369, 376 (Fla.1994) (trial court did not err in denying special instructions where "[a]ll of the requested *757 instructions [were] either adequately covered by the standard instructions, misstate[d] the law, or were not supported by the evidence."). Here, Stephens adequately showed the special instructions would have supported his theory of defense; however, he failed to establish that the special instructions were necessary and were not likely to confuse the jury.
Moreover, Stephens claims he is entitled to the special instructions based upon the holdings in Parker v. State, 570 So.2d 1048 (Fla. 1st DCA 1990), and Mills v. State, 407 So.2d 218 (Fla. 3d DCA 1981). However, the statements upon which the special instructions are based have been taken out of context and would likely confuse the jury. In both of those cases, the defendants were found guilty of felony murder. In Mills, which was quoted by Parker, the underlying felony was a robbery, which occurred twenty-four hours prior to the murder. There, the court stated:
The fact that the taking of Meli's money and car had been accomplished some twenty-four hours before the killing occurred did not, under the facts of the present case, terminate the robbery so that it could no longer constitute the underlying felony for felony murder purposes. In the absence of some definitive break in the chain of circumstances beginning with the felony and ending with the killing, the felony, although technically complete, is said to continue to the time of the killing. Jefferson v. State, 128 So.2d 132 (Fla.1961). Neither the passage of time nor separation in space from the felonious act to the killing precludes a felony murder conviction when it can be said, as it can be so readily here, that the killing is a predictable result of the felonious transaction. Campbell v. State, 227 So.2d 873 (Fla. 1969).
Mills, 407 So.2d at 221 (footnote omitted). The Mills court further explained, "[T]the application of a rule of technical termination of the felony would produce the absurd result that felony murder would be precluded in all instances where the killing followed the `completion' of the felony." Id. at 221 n. 5. Thus, the cases Stephens cites in support of his argument that he was entitled to the special instructions demonstrate that the instructions would have been, at a minimum, confusing and misleading, if not a misstatement of the law altogether. Accordingly, Stephens has failed to demonstrate the trial court clearly abused its discretion in denying the proposed special instructions. See Sans, 731 F.2d at 1530; Parker, 641 So.2d at 376.

Denial of Motion to Change Venue
Stephens also argues the trial court erred in denying his motion for change of venue. Stephens has not demonstrated error in the trial court's ruling. In Rolling v. State, 695 So.2d 278 (Fla. 1997), this Court held the defendant has the burden of proving community prejudice denied him the right to a fair trial. Stephens has failed to allege facts indicating abnormal pretrial publicity. In addition, the trial court went beyond the necessary precautions to ensure the jury selected was fair and impartial by conducting individual voir dire of the potential jurors to detect any potential juror who had been persuaded by the pretrial publicity. Out of the 115 potential jurors, the court leniently dismissed 40 potential jurors because it felt there was "some reasonable doubt" that they could be fair and impartial. Further, the court noted two-thirds of the potential jurors, including all of the jurors who were ultimately selected to serve on the jury, stated they could be fair and impartial. Accordingly, the trial court acted within its discretion *758 in denying the motion for a change of venue.

Denial of Nelson Inquiry
Next, Stephens argues the trial court erred in denying him a Nelson[10] inquiry, after he raised the issue of counsel's competency. The record does not contain the handwritten note Stephens presented to the trial court expressing his concerns; however, the trial court characterized the concerns as a lack of contact between Stephens and his attorneys. Additionally, Stephens stated on the record that in addition to a lack of contact he was concerned with the failure of counsel to give him copies of paperwork. Thus, it is apparent that Stephens voiced dissatisfaction with counsel but did not actually question counsel's competency. Under such circumstances a full Nelson inquiry is not necessary. See Smith v. State, 641 So.2d 1319 (Fla.1994).
Under the circumstances of this case, the trial court made an adequate inquiry into the complaint and properly remedied the problem by telling counsel to visit Stephens more frequently and provide him with the proper records. See Davis v. State, 703 So.2d 1055 (Fla.1997). Moreover, the record reflects Stephens subsequently expressed satisfaction with counsel. For example, on December 5, 1997, Stephens swore that he discussed all aspects of this case with his attorneys, did not want any delay, and wanted the trial to go forward as scheduled on December 8, 1997. Stephens did not tell the court that he was still dissatisfied with his counsel or that the lack of communication had not been remedied.
On December 8, 1997, Stephens also signed a "Plea of Guilty" form that concerned charges integrally intertwined with those ultimately tried. In the plea form he agreed he had fully discussed all aspects of this case with his attorney. He also indicated to the court that he was satisfied with the services of his attorney in the case. In the plea colloquy, Stephens told the trial court that he had had enough time to discuss his case with his attorneys and that he was satisfied with the representation that they had given him in this case.
Thus it is clear that the trial court sufficiently responded to Stephens' complaints about his appointed counsel. Additionally, Stephens demonstrated a subsequent satisfaction with his counsel which shows any possible error was harmless. See Scull v. State, 533 So.2d 1137, 1141 (Fla.1988) (stating any failings of the inquiry were mooted by defendant's expressions of satisfaction with counsel's representation).

Query on Electric Chair Statement
Stephens next alleges the trial court reversibly erred by allowing the State to elicit testimony from him that he had asked authorities to help him get the electric chair. After being arrested for the crimes in this case, Stephens asked authorities if they could help him get the death penalty. The State claimed the statement was relevant because it showed a conscious recognition of guilt. However, during a proffered cross-examination, Stephens testified that he had asked the authorities to help him get the death penalty because of all of the crimes he had committed in his life. Stephens' counsel objected to the statement, arguing it was either irrelevant or that the prejudicial impact of such statement outweighed its probative value. The trial court overruled the objection and allowed Stephens to testify that he had asked the authorities to help him get the death penalty because of *759 all of the crimes he had committed in his life, not because he felt guilty for murdering Sparrow III.
In order for evidence to be relevant it must have some logical tendency to prove or disprove a fact which is of consequence to the outcome of the case. See Charles W. Ehrhardt, Florida Evidence § 401 (1999). Here, the State alleged the statement was relevant because it had a logical tendency to prove the defendant felt guilty for murdering Sparrow III. The defendant's state of mind at the time he made the statement was relevant to prove a material fact. See Johnson v. State, 660 So.2d 648 (Fla.1995).
Stephens also argues the statement was unduly prejudicial. Under section 90.403, Florida Statutes (1997), relevant testimony may be excluded if the probative value of the evidence is substantially outweighed by the likelihood of unfair prejudice. However, the trial court should be given wide discretion in determining whether the evidence is unduly prejudicial. See Sims v. Brown, 574 So.2d 131 (Fla.1991) (finding the weighing of relevance versus prejudice or confusion is best performed by the trial judge who is present and best able to compare the two); Lewis v. State, 570 So.2d 412, 415 (Fla. 1st DCA 1990) (holding the trial judge should be given wide discretion in determining whether evidence should be admitted over a section 90.403 objection).
Weighing all the evidence in this case and considering the overwhelming evidence of guilt, we find the trial judge acted within his discretion, and any potential error was harmless. See Walker v. State, 707 So.2d 300 (Fla.1997); Shellito v. State, 701 So.2d 837 (Fla.1997); Reaves v. State, 639 So.2d 1 (Fla.1994). Here, the State did not ask Stephens to tell the jury about his other crimes. It merely asked Stephens if he had made an agreement with the authorities that he would tell them everything that had happened in this case if they agreed to help him get the electric chair. It was Stephens who went beyond that to explain that he had asked for help in getting the electric chair for all of the other crimes he had committed in his life. Moreover, the jury was never told that the other crimes were five other robberies and another murder where he shot the victim three times. Stephens has failed to demonstrate error in the admission of this relevant information.

Proportionality
Stephens, citing to Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), and Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), also argues the trial court erred in allowing the jury to consider death as a potential sentence because his state of mind did not amount to a reckless indifference to human life. Thus, he argues his sentence of death is disproportionate to the crime he committed. We disagree.
The United States Supreme Court and this Court have consistently held that a sentence of death must be proportional to the defendant's culpability. Thus, in Enmund the Court indicated that in the felony murder context a sentence of death was not permissible if the defendant only aids and abets a felony during the course of which a murder is committed by another and defendant himself did not kill, attempt to kill, or intend that a killing take place or that lethal force be used. Later, in Tison the Court said a sentence of death in the felony murder context can be proportional if the defendant is a major participant in the felony and the defendant's state of mind amounts to a reckless indifference to human life.
*760 In the present case, Stephens was not merely an aider or abetter in a felony where a murder was committed by others; Stephens personally committed the crimes of burglary and robbery. He then personally kidnapped the child victim and drove him to a location that was unknown to his parents. Stephens and Stephens alone stole the CD player out of the car and left the three-year old child in the hot, closed car. This record demonstrates that Stephens was indifferent to the fate of this helpless child. Under these circumstances the death penalty is proportional. See Van Poyck v. State, 564 So.2d 1066, 1070 (Fla.1990) (finding the death sentence proportional where the defendant was the instigator and major participant in the underlying crimes who came to the scene "armed to the teeth" and knew lethal force could be used).
Additionally, we find that the sentence of death in this case is proportional to other felony murder cases where we have upheld the death sentence. While this case presents some unique circumstances that have not been encountered before, we have affirmed the imposition of a death sentence in the felony murder context with identical aggravating circumstances and similar types of mitigating evidence. Recently, in Lukehart v. State, 776 So.2d 906, 925 (Fla.2000), we affirmed a death sentence for a murder committed during the perpetration of aggravated child abuse. Three aggravating circumstances were found: (1) the murder was committed during the commission of a felony; (2) the defendant had a conviction of a prior violent felony; and (3) the victim was under the age of twelve. In addition, a number of mitigating factors were found, including the two statutory mitigating factors of age (the defendant was twenty-two) and defendant's substantially impaired capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law. Some weight was given to the four nonstatutory mitigating factors that Lukehart abused drugs and alcohol; his father was an alcoholic and abusive; he was sexually abused as a child; and he was employed. The same three aggravating circumstances are present in this case. And while there are no statutory mitigating circumstances in Stephens' case, nonstatutory mitigating circumstances relating to the defendant's childhood, personal life, and employment were found.
Moreover, like Lukehart, Stephens' prior violent felony was given great weight and is similar to the events which led to the present murder. In 1992 Stephens and two companions entered the home of LaTonya Jackson, a sixteen-year-old, while she was with her boyfriend. Stephens had a sawed-off shotgun which he placed against Ms. Jackson's head and threatened to kill her. This is the same type of home invasion which culminated in the death of Sparrow III, and these events occurred within five years of the prior case.
The defendant argues this case is analogous to the situations this court addressed in Benedith v. State, 717 So.2d 472 (Fla. 1998), and Jackson v. State, 575 So.2d 181 (Fla.1991). We disagree. In both Benedith and Jackson the death penalties were found disproportionate because the defendant's state of mind did not meet the criteria discussed in Enmund and Tison. More specially, there was no evidence that the defendants either did the shooting, possessed or carried a weapon, or intended harm to any person. In contrast, Stephens personally abducted Sparrow III and left this three-year old child in a hot car to bake to death.
Under the facts and circumstances of this case, the death penalty is not disproportionate and is based on Stephens' personal *761 culpability for the murder of Sparrow III.

Assessments of Aggravating and Mitigating Circumstances
Stephens makes several arguments that the trial court erred in weighing the aggravating and mitigating circumstances in his case. We find the trial court acted within its discretion in making this determination. In reviewing the trial court's order, we must determine whether there is substantial, competent evidence in the record to support the aggravators and mitigators found to exist. See Gordon v. State, 704 So.2d 107 (Fla.1997); Larzelere v. State, 676 So.2d 394 (Fla.1996).
First, Stephens argues the trial court improperly considered the same felonies used to support the felony murder conviction as prior felony convictions under section 921.141(5)(b), Florida Statutes (1997). This argument is without merit. Stephens was convicted of multiple felonies involving multiple victims. Only one of those felonies is needed for the first-degree felony murder conviction. He cannot complain because his criminal episode has resulted in numerous crimes and more than one aggravating circumstance. See, e.g., James v. State, 695 So.2d at 1229 (Fla. 1997) (holding felonies committed contemporaneously with the capital crime can qualify under the prior violent felony aggravator where, as here, the criminal episode involved multiple victims).
Next, Stephens argues the trial court erred in finding and giving great weight to the fact that the death of this child occurred while the defendant was engaged in or fleeing from the crimes of armed kidnapping, armed robbery and burglary with an assault. Stephens argues he had reached a point of safety prior to the child's death and, therefore, the court erred in finding this an aggravating factor. As previously discussed, there is substantial, competent evidence that Sparrow III died as a result of the felonies Stephens committed. Therefore, this aggravator should be upheld.
Next, Stephens argues the trial court failed to give due consideration to his acceptance of responsibility and remorse. The determination of what weight, if any, is to be given to a particular aggravating or mitigating circumstance is left within the sound discretion of the trial court. See Gordon v. State, 704 So.2d 107 (Fla.1997). We will not disturb that determination absent an abuse of discretion. Since the record adequately supports the trial court's conclusions that the pleas were made for tactical advantage and for use as argument before the jury, we will not disturb those findings. See Gordon, 704 So.2d at 118; Larzelere, 676 So.2d at 394. In addition, the trial judge found that Stephens appeared cavalier throughout the trial, a factor supporting the finding that he was not truly remorseful. The trial court's failure to give great weight to this mitigating factor is supported by competent, substantial evidence.
Finally, Stephens argues the trial court erred in failing to give adequate weight to Cummings' life sentence. This argument is without merit because Stephens testified Cummings did not know that he was going to the house to rob the occupants, and he acted alone when he kidnapped Sparrow III. Therefore, the record adequately supports the trial court's conclusion that Stephens and Cummings were not equally culpable. See Raleigh v. State, 705 So.2d 1324 (Fla.1997); Cardona v. State, 641 So.2d 361 (Fla.1994).

Constitutionality of Section 922.10
Stephens argues section 922.10, Florida Statutes (1997), which provided for execution by electrocution, is unconstitutional. This argument has been rejected by this *762 court on numerous occasions. See, e.g., Jones v. State, 701 So.2d 76 (Fla.1997); Ferguson v. State, 90 Fla. 105, 105 So. 840 (1925). Additionally, the statute was amended by the Legislature in January 2000 to allow for execution by either electrocution or lethal injection, the choice being that of the defendant.

Constitutionality of Section 921.141
Finally, Stephens argues section 921.141, Florida Statutes (1997), is unconstitutional. There is no merit to this argument. See, e.g., Brown v. State, 721 So.2d 274, 277 n. 6, 283 (Fla.1998) (rejecting multiple claims that section 921.141, Florida Statutes (1991), is unconstitutional under the Florida and United States Constitutions); Hunter v. State, 660 So.2d 244, 252 (Fla.1995); King v. State, 436 So.2d 50, 53 (Fla.1983).
For the reasons expressed above, we affirm Jason Demetrius Stephens' convictions and sentences, including his sentence of death.
It is so ordered.
HARDING, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., concurs with an opinion.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which SHAW and PARIENTE, JJ., concur.
WELLS, C.J., concurring.
I concur with the majority and write only to comment on proportionality. I do not agree with the concurring opinion that this is anything akin to a parent leaving a child in a car. This defendant committed a group of felonies which involved terrorizing this child-ultimately leading to the child's death. Florida's death penalty is intended to cover this criminally caused death, and in view of the age of the child, is proportionate, similar to our recent decision in Lukehart v. State, 776 So.2d 906 (Fla.2000).
ANSTEAD, J., concurring in part and dissenting in part.
I respectfully disagree with the majority's conclusion that the circumstances surrounding the death in this case place it in that most narrow category of murder cases: the most aggravated and least mitigated mandating the imposition of the death penalty. In essence, the majority is ordering the death penalty to be imposed in a case that would ordinarily be considered manslaughter, and apparently doing so simply because the crime took place during the commission of another crime.[11] This decision ignores our own precedent as well as the controlling law from the U.S. Supreme Court.
Tragically, we read from time to time of negligent parents or other caretakers in Florida and elsewhere who may leave children alone in closed cars during warm weather conditions. When a tragic death occurs manslaughter charges are sometimes brought against the caretakers for their gross neglect. Cf. Mudd v. State, 638 So.2d 124 (Fla. 1st DCA 1994) (involving manslaughter conviction of mother for death of seven-month-old child left in car for over eight hours; conviction reversed because of improper admission of evidence of other misconduct). Numerous other examples *763 are contained in the opinions of the district courts where similar tragic incidents resulting in the deaths of innocent children have been consistently treated as manslaughter or other lesser degrees of homicide. See, e.g., Mudd; McDaniel v. State, 566 So.2d 941 (Fla. 2d DCA 1990) (third-degree murder for death of infant son due to chronic illness and malnutrition); Jakubowski v. State, 494 So.2d 277 (Fla. 2d DCA 1986) (third-degree felony murder for death of six-year-old victim due to child abuse).
Like the victims involved in these similar cases, the child-victim here died as a result of a senseless series of events instigated by the defendant, concluding with the child's tragic, but unintended death, when he was abandoned in a closed, but unlocked, car by the defendant at a time when the outside temperature was in the high eighties. Importantly, it is undisputed here that neither the jury nor the trial judge could conclude that the defendant intended to kill the child. Indeed, in an unusual, but significant gesture, the State agreed that the trial court could consider in mitigation statements made by the jury foreman "that the jury generally did not believe that the Defendant intended to kill." In addition to recording this agreement in its sentencing order the trial court also concluded under its analysis of "Nonstatutory Mitigating Factors" that because "the Court cannot, beyond a reasonable doubt, find that the defendant intended to kill, requires the Court to give this factor significant weight, which it has done."
However, the majority has chosen to ignore this critical factor of lack of an intent to kill even while relying solely on a theory of felony murder to sustain the conviction for first-degree murder. While the legal fiction of substituting the commission of a felony in place of intent may technically qualify this case as a first-degree murder case, it still leaves us with a death under circumstances that Florida courts have consistently treated as manslaughter or some other lesser degree of homicide. See Mudd. We should hesitate before making such a giant leap and elevating a crime ordinarily characterized as culpable negligence and prosecuted as manslaughter, to one deserving of the death penalty. Having done so, for example, we will be hard pressed in the future not to extend this reasoning to other comparable circumstances, such as reckless driving in flight from a robbery.
In placing this case in the category of the "worst of the worst," we also place Florida's death penalty laws in serious jeopardy of failing the United States Supreme Court's test for constitutionality by being narrowly drawn only to apply to the most egregious of killings. As conceded by the majority in its opinion, the United States Supreme Court has expressly limited invocation of the death penalty to those situations in which a defendant intends to kill or his conduct is so egregious as to be tantamount to an intent to kill. See Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).
In Enmund, Justice White, writing for the majority, explained: "It is fundamental that `causing harm intentionally must be punished more severely than causing the same harm unintentionally.'" See id. at 798, 102 S.Ct. 3368 (quoting H.L.A. Hart, Punishment and Responsibility 162 (1968)). The majority in Enmund pointed out that imposing the sentence of death on a person who did not kill and neither attempted nor intended to the kill the victim would not serve the two primary purposes for imposing death as a form of punishment: deterrence and retribution. Justice White explained the Court's rationale:

*764 In Gregg v. Georgia the opinion announcing the judgment observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." 428 U.S., at 183 [, 96 S.Ct. 2909] (footnote omitted). Unless the death penalty when applied to those in Enmund's position measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment. Coker v. Georgia, supra, [433 U.S. 584] at 592 [, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977)]. We are quite unconvinced, however, that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken. Instead, it seems likely that "capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation," Fisher v. United States, 328 U.S. 463, 484 [, 66 S.Ct. 1318, 90 L.Ed. 1382] (1946) (Frankfurter, J., dissenting), for if a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not "enter into the cold calculus that precedes the decision to act." Gregg v. Georgia, supra, at 186, 96 S.Ct. 2909 (footnote omitted).
Id. at 798, 102 S.Ct. 3368.
Five years later, in Tison, the Supreme Court explained that its holding in Enmund may also permit capital punishment where the defendant was a major participant in a dangerous felony and acted with reckless disregard for human life. See Tison v. Arizona, 481 U.S. at 158, 107 S.Ct. 1676. The Court again focused on the defendant's mental state in holding "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." Id. at 157-58, 107 S.Ct. 1676. Justice O'Connor, writing for the majority, explained:
A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime. Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished. The ancient concept of malice aforethought was an early attempt to focus on mental state in order to distinguish those who deserved death from those who through "Benefit of ... Clergy" would be spared. 23 Hen. 8, ch. 1, §§ 3, 4 (1531); 1 Edw. 6, ch. 12, § 10 (1547). Over time, malice aforethought came to be inferred from the mere act of killing in a variety of circumstances; in reaction, Pennsylvania became the first American jurisdiction to distinguish between degrees of murder, reserving capital punishment to "wilful, deliberate and premeditated" killings and felony murders. 3 Pa. Laws 1794, ch. 1766, pp. 186-187 (1810). More recently, in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the plurality opinion made clear that the defendant's mental state was critical to weighing a defendant's culpability under a system of guided discretion, vacating a death sentence imposed under an Ohio statute that did not permit the sentencing authority to take into account "[t]he absence of direct proof that the defendant intended to cause the *765 death of the victim." Id., at 608 [, 98 S.Ct. 2954] (opinion of Burger, C.J.); see also Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (adopting position of Lockett plurality).
Id. at 156, 107 S.Ct. 1676. Hence, as in Enmund, the Tison Court emphasized the critical importance of the defendant's mental state and level of culpability in determining whether death is a permissible penalty. The Court also pointed out the critical importance of considering the absence of proof that the defendant intended to kill the victim. Today's majority ignores the Supreme Court's admonition.
Under Enmund and Tison, in other words, if the defendant and his cohorts commit an armed robbery with the avowed attitude of shoot-to-kill if there is the slightest resistance, this is tantamount to an intent to kill. However, such a situation is simply not involved here. Here, we have no "shoot-to-kill" attitude or action. Rather, it is undisputed and conceded by all that the defendant did not intend to kill the child, and the death occurred in a manner we have consistently treated as a lesser degree of homicide and certainly not deserving of the death penalty. Hence, we have gone far astray from the United States Supreme Court's strict limitations in Enmund/Tison, and, in doing so have placed the Florida death penalty scheme at constitutional risk. Here, because the defendant committed a number of felonies during a crime spree, including kidnapping the child-victim, he has properly been convicted of felony murder and faces a sentence of life in prison without the possibility of parole even if his death sentence is set aside. However, the conviction for felony murder does not change the facts surrounding the actual death, and those facts, as reflected in the statements by the jury foreman and the trial court, do not support a finding of an intentional killing. Rather, those facts, like the tragic incidents involving negligent parents and caretakers cited above, while abhorrent, prevent this case from being among the "worst of the worst" for which the death penalty is reserved.
SHAW and PARIENTE, JJ., concur.
NOTES
[1] Seven people were at the house when Stephens first entered including: (1) Robert Sparrow, III; (2) Robert Sparrow, Jr., the owner of the house and Robert Sparrow, III's father; (3) Consuelo Brown, Robert Sparrow, III's mother; (4) Kahari Graham, Robert Sparrow, III's six-year-old half-brother and Consuelo Brown's other son; (5) Tracey Williams; (6) Derrick Hosea Dixon; and (7) Tammy Cobb. Two other victims entered the house after Stephens: (1) David Cobb; and (2) Roderick Gardner.
[2] Asphyxiation can be either strangulation or suffocation.
[3] Petechiae are hemorrhages of the small veins caused by lack of oxygen. When found on the face and in the eyes, they are typically a sign of suffocation or strangulation. However, this is nonspecific evidence because petechiae may also be caused by laying a body face down after death. Once the heart stops beating, the blood settles in the lowest part of the body. If the face is the lowest part of the body, as in this case, blood settles in the face potentially resulting in petechiae of the face and eye lining.
[4] The trial court found three aggravating circumstances: prior violent felonies; murder during the commission of a felony; and the age of the victim, all of which were given great weight. The trial court discussed and gave some weight to a number of nonstatutory factors including: volunteer church work; the defendant's fondness for children; employment; Stephens' religious and supportive family; Stephens' educational background; adjustment to incarceration; lack of intent to kill; a codefendant's life sentence; and Stephens' pleas of guilty to other offenses.
[5] Prior to trial, Stephens pled guilty to several robberies including the robbery of Derrick Dixon. The fact of these pleas was used by Stephens in his attempt to convince the jury that he readily admitted to the crimes he in fact committed.
[6] Stephens requested three special instructions. Special Instruction Number 1 provided:

If you find that there was some definitive break in the chain of circumstances beginning with the crimes of kidnapping, robbery or burglary, and ending with the death of Robert Sparrow, III or, if you have a reasonable doubt about it, you should find the defendant, Jason Demetrius Stephens not guilty of first degree felony murder.
Special Instruction Number 2 provided:
If you find that because of the passage of time and/or the separation in space from the felonies of kidnapping, robbery and/or burglary that those felonies had been completed prior to the death of Robert Sparrow, III or, if you have a reasonable doubt about it, you should find the defendant, Jason Demetrius Stephens not guilty of first degree felony murder.
Special Instruction Number 3 provided:
If you find the death of Robert Sparrow, III was not a predictable result of the felonious acts of Jason Demetrius Stephens, or, if you have a reasonable doubt about it, you should find the defendant, Jason Demetrius Stephens not guilty of first degree felony murder.
[7] See, e.g., Pomeranz v. State, 703 So.2d 465 (Fla.1997) (finding no merit to claim that the trial court erred in giving a jury instruction on principals when there was no evidence to support this theory).
[8] See, e.g., Elledge v. State, 706 So.2d 1340 (Fla.1997); Branch v. State, 685 So.2d 1250 (Fla.1996) (holding it was not error to refuse to use former standard instruction on circumstantial evidence where jury was fully instructed on reasonable doubt and burden of proof); Trepal v. State, 621 So.2d 1361 (Fla. 1993) (upholding the trial court's denial of special instruction); Hansbrough v. State, 509 So.2d 1081 (Fla.1987) (upholding trial court rejection of four special jury instructions on sanity stating "the standard instructions adequately apprised the jury as to the law").
[9] See, e.g., United States v. Sans, 731 F.2d 1521, 1530 (11th Cir.1984) (denying an instruction even though it was a correct statement of the law because it was misleading); Ray v. State, 403 So.2d 956 (Fla.1981).
[10] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).
[11] Manslaughter is defined as "[t]he killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification ... and in cases in which such killing shall not be excusable homicide or murder." § 782.07(1), Fla.Stat. (1999). Whereas manslaughter by "act or procurement" does require a showing of an intent to commit an unlawful act, manslaughter by "culpable negligence" does not. See Taylor v. State, 444 So.2d 931, 934 (Fla.1983).