# Supreme Court of Florida

_____

No. SC2023-0696
_____

**MICHAEL W. JONES,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 10, 2025

GROSSHANS, J.

Michael Wayne Jones appeals his convictions of first-degree murder and sentences of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm in all respects.

I

A

Michael and Casei Jones married in 2017. They settled in Summerfield, Florida, along with four children—Cameron and Preston Bowers were Casei's sons from a previous marriage; while

Mercalli and Aiyana Jones were Jones and Casei's daughters in common.

One mid-July evening in 2019, Jones and Casei got into an argument which escalated into a screaming match. According to Jones, Casei picked up a baseball bat. Jones grabbed the bat away from Casei and proceeded to beat her to death with it. Jones then wrapped Casei's body in a shower curtain, stuffed her body in a plastic storage box, and hid the box in the back bedroom. The children were not aware of their mother's death or the location of her body.

Shortly after Casei's murder, Jones reached out to his ex-wife Sarah in an attempt to rekindle a relationship with her and develop a bond with the children they had together. While communicating with Sarah, Jones claimed that he separated from Casei and that she had moved to live near her mother.

As he continued his efforts to foster a relationship with Sarah, Jones began to field questions from Casei's children about their mother's whereabouts. In response to one such question, Jones said that he and Casei were taking a break. Jones also lied to

Casei's extended family, often impersonating her in texts and on social media.

In late July, all four children left for extended visits with family members, resulting in less questions about Casei. In August, just days before school began, Jones picked up the children and returned with them to the house in Summerfield. Jones realized the problem posed by the boys going to school and worried they might reveal they had not seen their mother for weeks. As he would later confess to police, "One day I just realized school is starting. The boys are school age and I started to just choke them out."

First, Jones killed nine-year-old Cameron by climbing on top of the sleeping boy and strangling him to death with his bare hands. Once Cameron was dead, Jones put his body inside a suitcase and left the suitcase in the boys' bedroom.

The next day, Preston (age four) asked Jones about his brother. That night, after Preston fell asleep, Jones filled up the bathtub and placed a large zip tie around Preston's throat. Jones carried Preston to the bathroom where he held the child facedown in the bathtub until he drowned. Jones then put Preston's body in

a trash bag and left it in the bathroom overnight. He would later place the body into a storage box.

With the death count now at three, traces of the murders became evident inside the home. To reduce such signs, Jones scattered cat litter over the floor that was stained with the bodily fluids of the victims. He also wrapped the body-containing boxes in plastic to suppress the smell of decomposition.

Having taken these measures, Jones continued to live in the home with his two daughters, notwithstanding the presence of the three decaying bodies. But near the end of August, Jones received an eviction notice. The day before the scheduled eviction, Jones carried Mercalli (age two) to the bathroom where he drowned her facedown in the bathtub. Jones then returned to the living room for one-year-old Aiyana. He drowned her just as he had her sister.

He put the girls' bodies in separate trash bags, before placing them into one box. Jones then placed the five bodies—all now contained in plastic storage boxes—in Casei's minivan. He drove the van to Jacksonville to stay with Sarah, telling her that he and Casei had separated and that the children were with Casei.

Jones kept up this ruse for almost two more weeks, continuing to impersonate Casei in text messages. Ultimately, Casei's family grew suspicious of the irregular communication. In mid-September, Casei's mother contacted the Marion County Sheriff's Office and asked officers to conduct a wellness check on Casei. When the responding detective entered the Summerfield home, he noticed a strong odor, which he believed to be from decomposition and bleach. Subsequently, after obtaining a warrant, law enforcement secured physical evidence from the home. Meanwhile, having learned that Casei's vehicle was missing, law enforcement published a "be on the lookout" for Casei, her four children, and the minivan.

As the investigation continued, law enforcement learned of Sarah and reached out to her. On a call—with Jones directing her—Sarah said that she had last seen Jones, Casei, and the kids at a McDonald's in Palatka, Florida, just a few days earlier. These statements were false. Sarah, for her part, later admitted lying to police. Eventually, Sarah told Jones that "clearly something [was] going on" and that "he needed to talk to [the police]."

In response, Jones fled Florida, driving north. After crossing into Georgia, he left the boxes containing the bodies of the four children in a heavily wooded area. Jones then continued north, eventually running off the road and crashing into a culvert. The responding officer, Deputy Wade Bennett, arrived at the crash scene and smelled the odor of decomposition coming from the wrecked van. When asked what he was doing in Georgia, Jones volunteered that the smell was from his dead wife whom he had killed. Deputy Bennett then asked if Jones had any children, and he stated he did, but that they were with their grandmother.

Deputy Bennett took Jones to a Georgia jail for questioning. There, Jones confessed to the five killings and provided a detailed account of the surrounding events and circumstances. At the request of the officer, Jones led law enforcement to the children's remains.[1]

After these developments, Jones was transferred to a nearby sheriff's office. There, a detective from Marion County (who had learned of the recent developments in Georgia) interviewed Jones.

---

1. The bodies were confirmed by a Georgia medical examiner to be those of Preston, Cameron, Aiyana, and Mercalli.

As part of this interview, Jones described in detail the murders of the four children. When the detective asked Jones why he committed the murders, Jones said that "everything" was on him and that all the pressure got to him.

Jones was later transported back to Florida and interviewed a third time. During that interview, the detective again questioned Jones about his motive:

> DETECTIVE BARTLETT: Okay. I'm trying to think of everything to make sure we covered everything. Obviously the one question is, everybody's asked me why. I know -- I understand why Casei. Why the boys, why your daughters?
> THE DEFENDANT: I don't know. It's just everything mounted up. Just seemed like no way out.

B

A grand jury indicted Jones on four counts of first-degree murder (for the death of the children) and one count of second-degree murder (for Casei's death). That same day, the State filed a notice of intent to seek the death penalty. Ultimately, Jones pled guilty to all five murders as charged in the indictment. Following a colloquy with Jones and the prosecutor's presentation of the factual basis for the crimes, the court accepted Jones's guilty pleas.

C

At the penalty phase, the State sought to prove six aggravating factors for each first-degree murder count: (1) the defendant was previously convicted of a violent felony; (2) the murder was committed for the purpose of avoiding lawful arrest; (3) the murder was especially heinous, atrocious, or cruel (HAC); (4) the murder was cold, calculated, and premeditated (CCP); (5) the victim was a person less than twelve years of age; and (6) the murder was committed by a person in a position of familial authority. Of those six, Jones chose only to dispute the "avoid arrest" aggravator.[2]

Specifically, the defense argued that Jones killed the children due to a psychotic episode. To support that theory, Jones presented several expert witnesses. Dr. Harold Bursztajn, a neuropsychiatrist who met with Jones fifty-two times, testified that

---

2. In addition to challenging this aggravator, the defense sought to prove fifty-four mitigating circumstances, including three statutory mitigators. Those statutory mitigators were: (1) the defendant had no significant history of prior criminal activity; (2) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (3) the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired.

Jones's "delusions and hallucinations are most consistent with an illness . . . called the schizoaffective spectrum." Dr. Stephen Nelson, a pediatric neurologist and epileptologist, diagnosed Jones with a neurodevelopmental disorder and testified that this disorder "would make him prone to psychosis." The final expert, Dr. John Fabian, a forensic psychologist and neuropsychologist, diagnosed Jones with "major depressive disorder with psychotic features" and opined Jones underwent a psychotic break after killing Casei.

Relying in part on this expert evidence, the defense requested a special jury instruction that included additional nonstatutory considerations. The court declined to give the requested instruction, and instead read the standard instruction to the jury.

At the conclusion of the penalty phase, the jury recommended sentences of death for the four first-degree murder counts. Consistent with the jury's recommendation, the court imposed four death sentences.[3] In its sentencing order, the court found that the State had proven all six aggravating factors—to which it assigned great weight. As to mitigation, the court found one statutory

---

3. Jones waived his right to a *Spencer* hearing. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

mitigator—that Jones had no significant history of prior criminal activity—and assigned it little weight. The court also determined that the defense had proven forty nonstatutory mitigating factors, with assigned weights ranging from slight to none. In its conclusion, the court found that the aggravators "substantially outweigh[ed]" the mitigating circumstances, warranting imposition of the death sentences.

This appeal followed.

## II

Jones raises three issues for our review. First, Jones argues that the trial court's refusal to supplement the standard jury instruction on the avoid-arrest aggravator was improper. Next, he contends that Florida's capital sentencing scheme unconstitutionally permits the arbitrary imposition of death sentences. For his final argument, Jones claims that the death penalty violates the Eighth Amendment in light of evolving standards of decency. And though not raised by Jones, we also

review whether his guilty plea was knowingly, intelligently, and voluntarily entered.[4]

## A

Jones contends the trial court erred by denying his request for a special jury instruction.[5]  To prevail on this claim, Jones has the burden to demonstrate "(1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of the defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing." *Hudson v. State*, 992 So. 2d 96, 112 (Fla. 2008) (citing *Stephens v. State*, 787 So. 2d 747, 756 (Fla. 2001)).  The State concedes prongs one and three, thus we focus our discussion solely on the disputed prong.

In analyzing the second prong, we look to the instructions as a whole to see if they "adequately address the applicable legal standards." *See Stephens*, 787 So. 2d at 755.  And we have found standard instructions adequate even when those instructions do

---

4.  *See Altersberger v. State*, 103 So. 3d 122, 128 (Fla. 2012).

5.  We review the trial court's ruling for abuse of discretion. *Stephens v. State*, 787 So. 2d 747, 755 (Fla. 2001).

not contain judicially crafted interpretations of the aggravators. *See Davis v. State*, 698 So. 2d 1182, 1193 (Fla. 1997); *Stephens*, 787 So. 2d at 755; *see also Loyd v. State*, 379 So. 3d 1080, 1095 (Fla. 2023), *cert. denied*, 145 S. Ct. 188 (2024).

Here, the jury was instructed to determine if "[t]he First Degree Murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." That standard instruction tracks the statutory text. *See* § 921.141(6)(e), Fla. Stat. (2022) (listing as an aggravating factor that "[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody"). The statute and standard instruction both focus on the purpose for which the murder was committed—i.e., to avoid arrest.

Jones contends that the standard jury instruction, as given, was insufficient. We disagree and find the instruction adequately encompassed Jones's theory of defense. *See Davis*, 698 So. 2d at 1192-93 (rejecting argument that an avoid-arrest instruction that tracked the statute was legally inadequate because it did not include a comparable special instruction).

As a defense to the aggravator, counsel argued that Jones did not kill the children for the purpose of avoiding arrest because his actions were instead the product of a psychotic episode. Jones's defense also emphasized that the children had not witnessed the crimes, so killing them would not have aided him in avoiding arrest.

It is true that the instruction Jones requested had additional language not contained in the standard instruction. Indeed, the requested instruction would have added the victim's status as a consideration: "Where the victim of the homicide is not a law enforcement officer, the State must prove beyond a reasonable doubt that the sole or dominant motive for the murder was to avoid a lawful arrest."[6]

However, the absence of this instructional language did not prevent defense counsel from emphasizing the status of the children as non-eyewitnesses and non-law enforcement. Nor, as seen above, did its absence foreclose an argument that Jones's

---

6. Neither the standard instruction, nor the statute, addresses the status of the victim. The additional language proposed by Jones derives from this Court's holding in *Mullens v. State*, 197 So. 3d 16, 27-28 (Fla. 2016) (holding that the State bears a heightened burden of proof when the avoid-arrest aggravator is applied to non-law enforcement victims).

psychotic break was the real reason for the children's murders.  The fact that the jury categorically rejected Jones's defense in this regard does not render the instruction itself inadequate.

For these reasons, we hold that the trial court did not abuse its discretion in declining to give the instruction Jones requested.  However, even if Jones succeeded in showing an abuse of discretion, any instructional flaw would be harmless beyond a reasonable doubt.

We begin with the observation that the jury found five other aggravators—including the CCP, HAC, and prior-violent-felony aggravators.  The trial court, for its part, gave great weight to all the aggravators, noting that either the CCP or HAC aggravators standing alone would have justified the death penalty.  *See Santiago-Gonzalez v. State*, 301 So. 3d 157, 176 (Fla. 2020) (characterizing CCP and HAC as the weightiest aggravators).

Apart from aggravation, we also consider the mitigating circumstances presented at the penalty phase.  Here, those mitigators pale in comparison to the magnitude of the unchallenged aggravators.  Consequently, "[t]here is no reasonable possibility that

[the] potential error affected the sentence." *Lowe v. State*, 259 So. 3d 23, 60-61 (Fla. 2018).

B

Jones next asks us to find that Florida's capital sentencing scheme is arbitrary and capricious in violation of the Eighth and Fourteenth Amendments to the United States Constitution. According to Jones, the elimination of proportionality review[7] and the number and breadth of aggravating factors in section 921.141(6) results in arbitrary and unconstitutional sentences.

We have repeatedly rejected this argument and others like it. *See Cox v. State*, 390 So. 3d 1189, 1200 (Fla. 2024) (rejecting comparable argument and characterizing it as "well-worn"), *cert. denied*, 145 S. Ct. 1084 (2025); *Wells v. State*, 364 So. 3d 1005, 1015-16 (Fla. 2023) (rejecting as meritless the argument that Florida's death-penalty statute fails to sufficiently narrow the class of murderers eligible for the death penalty in violation of the Eighth Amendment). Jones has given us no reason to revisit this precedent, nor has he established any constitutional defect in

---

7. *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020).

Florida's death-penalty statute. Accordingly, he is not entitled to relief.

## C

As his final claim, Jones argues that the death penalty violates the Eighth Amendment based on "evolving standards of decency."

We have consistently held that Florida's death-penalty scheme satisfies both the state and federal constitutions. *See Cox*, 390 So. 3d at 1199-1200. The mere fact that other states may have shifted in their penological objectives does not render Florida's death penalty unconstitutional. *See, e.g.*, *Long v. State*, 271 So. 3d 938, 945 (Fla. 2019) (holding that Florida's death-penalty methods do not violate the Constitution simply because of the policy choices of other states). Jones is not entitled to relief as to this claim.

## III

In death-penalty cases, we "independently review the sufficiency of the evidence underlying [a first-degree murder] conviction, and the 'customary review' evaluates whether the conviction is supported by competent, substantial evidence." *Davidson v. State*, 323 So. 3d 1241, 1250 (Fla. 2021) (alteration in original) (quoting *Santiago-Gonzalez*, 301 So. 3d at 180). When a

defendant's guilty plea results in a death-eligible conviction, we examine the record to determine whether the defendant made that plea knowingly, intelligently, and voluntarily. *Doty v. State*, 170 So. 3d 731, 738 (Fla. 2015). In carrying out this review, we "scrutinize the plea to ensure that the defendant [1] was made aware of the consequences of his plea, [2] was apprised of the constitutional rights he was waiving, and [3] pled guilty voluntarily." *Fletcher v. State*, 343 So. 3d 55, 60 (Fla. 2022) (alterations in original) (quoting *Ocha v. State*, 826 So. 2d 956, 965 (Fla. 2002)).

Here, the trial court informed Jones of the nature of the charges, the consequences of his pleas, and the rights he would give up as a result of the pleas. Jones acknowledged all these things, but nevertheless remained firm in his decision to accept guilt. In addition, the court determined that Jones was in satisfactory physical and mental health and was making the decision to plead based on his own free will. Moreover, the evidence of Jones's guilt was overwhelming. He made incriminating statements on the day he was arrested and confessed in two recorded interviews. Physical evidence and witness testimony also decidedly pointed to Jones's guilt. The prosecutor noted this

evidence in its factual basis, which Jones acknowledged as adequate.

Thus, having independently reviewed the record, we conclude that Jones's guilty plea was knowingly, intelligently, and voluntarily entered.

IV

For the reasons given above, we affirm Jones's four first-degree murder convictions and death sentences.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I fully concur in the decision to affirm the first-degree murder convictions in this case.  Moreover, I recognize that the majority has rejected this Court's decades-long practice of conducting comparative proportionality review in cases involving the direct appeal of a sentence of death, and it has since repeatedly rejected such challenges.

However, I concur in result because I continue to adhere to the views expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020).

An Appeal from the Circuit Court in and for Marion County,
    Anthony M. Tatti, Judge
    Case No. 422019CF003487CFAXXX

Matthew J. Metz, Public Defender, and Robert J. Pearce III, Assistant Public Defender, Seventh Judicial Circuit of Florida, Daytona Beach, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Naomi Nichols, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee