[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-11727

_____

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
MAY 1, 2012
JOHN LEY

D.C. Docket No. 3:08-cv-00260-TJC-JRK

JASON DEMETRIUS STEPHENS,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 1, 2012)

Before TJOFLAT, BARKETT and WILSON, Circuit Judges.

PER CURIAM:

Jason Demetrius Stephens, a Florida prisoner on death row, appeals from the district court's denial of his petition for a writ of habeas corpus, brought pursuant to 28 U.S.C. § 2254. Stephens first argues that the trial court erred in sentencing him to death because his sentence is unconstitutionally disproportionate pursuant to the Eighth Amendment and the Supreme Court jurisprudence laid out in *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987). Stephens also claims that his trial counsel was ineffective at the guilt phase and at the penalty phase, and that the trial court erred in denying his claim that trial counsel was operating under a conflict of interest by delegating the primary responsibility for litigating Stephens' case to counsel for Stephens' co-defendant.

## I. Background

The Florida Supreme Court summarized the facts of this case as follows:

> The overwhelming evidence of guilt in this case shows Stephens broke into Robert Sparrow, Jr.'s house on June 2, 1997, at approximately 2 p.m., while a number of people were present. He robbed the people there and kidnapped a child. There were three or four other people with Stephens at the time he committed these crimes. However, Stephens refused to cooperate with the authorities in their efforts to identify the other individuals. One of the individuals, Horace Cummings (Cummings), turned himself into the police and was tried with Stephens. The other two individuals were never apprehended. Stephens testified at trial that Cummings and the

2

other unidentified individuals went to the house to buy drugs and were unaware of his plan to rob the occupants.

There were eight eyewitnesses in the house who testified at trial. While some of the details of the eyewitness' accounts varied, they all substantially agreed with the following summary of events. Stephens entered the house first, carrying a nine millimeter automatic gun. He was standing next to Robert Sparrow, III (Sparrow III), who was three years and four months old. Upon seeing the gun, the child's mother, Consuelo Brown, physically confronted Stephens. Stephens hit her with the gun on the bridge of her nose. Ms. Brown fell to the ground and her nose began to bleed. Stephens ejected a bullet onto the floor and informed the occupants that the gun was loaded. He told them that he wanted "money and weed." He demanded from Robert Sparrow, Jr. (Sparrow Jr.) the keys to a blue car located outside the house. Sparrow Jr. told Stephens the keys were with someone who was not present at the house.

Thereafter, two other individuals entered the house. One of the individuals was Cummings, but the other individual was never identified. Stephens made all the occupants lie down on the floor as he searched their pockets for valuables. The unidentified individual, referred to as Plats or Dreds because of the way he wore his hair, held the occupants of the house on the floor at gunpoint while Stephens located a secured room where he could put them. There was some testimony that Sparrow III said he was being choked, but it was unclear from the record who was choking him. After inspecting the house, Stephens determined the bathroom was the most secure location to put his hostages, and he ordered six of them, including six-year-old Kahari Graham, to crawl to the bathroom. Sparrow III was kept separate from the others.

Many of the eyewitnesses testified that Stephens showed his ID and said he was taking Sparrow III with him as insurance. Sparrow Jr. testified Stephens agreed he would leave the child at the corner if he was not followed. Stephens also testified he agreed to leave the child

3

somewhere, but he did not know what location the child's father had referred to in his testimony.

After the occupants had been secured in the bathroom, Sparrow Jr.'s half-brother, David Cobb (Cobb), and his friend, Roderick Gardner (Gardner), arrived at the house. Upon entry, they too were robbed and forced to crawl to the bathroom. One of the items Stephens took from Gardner was his car keys. Gardner was driving his mother's dark green Kia, which had roll-down windows and pull-up locks. There was testimony that Sparrow III had ridden in the Kia the day before he was killed. On that day, he had been scolded for rolling down the windows and trying to open the car door while it was moving. The record did not reflect that Stephens had any way of knowing whether the child was capable of rolling down the windows or opening the car door.

When Stephens exited the house with the child, the other individuals who Stephens testified had only gone to the house to buy drugs, were seated in the black car they had driven to the scene. Stephens testified the other individuals waved him away from the black car because he had the child. Stephens then ordered the boy to get into the Kia. Both cars pulled away from the house, with the Kia following the black car. After driving eight tenths of a mile, both cars pulled over in a residential neighborhood. It was approximately 2:30 p.m. The Kia was parked on the side of the street without the benefit of any shade. The outside temperature was approximately 82 degrees and sunny. The windows in the car were rolled up and all of the doors were closed. At 9:25 p.m., the dark green Kia was found. Sparrow III was dead, his body lying face down in the passenger's seat with his feet angled toward the steering wheel. The State argued Stephens suffocated Sparrow III before leaving the car. Stephens testified the boy was alive when he left him in the car.

The medical examiner, Bonifacio Floro, M.D., testified that in his expert medical opinion Robert Sparrow, III had probably died of asphyxiation. However, he could not conclusively rule out hyperthermia as the cause of death. He primarily relied upon multiple

4

"petechiae" in the face and eye lining as an indication of asphyxiation. He also noted there was a small four-millimeter scratch on the back of the child's neck. Dr. Floro concluded this scratch was probably caused by a fingernail. Dr. Floro testified the child's lower lip was bruised, indicating he had been suffocated. Dr. Floro also relied upon the lack of fingerprints or other evidence showing the child tried to roll down the window or open the door in concluding it was more likely that Sparrow III died from asphyxiation than hyperthermia.

Steven Frank Dunton, M.D., testified on the defendant's behalf. After reviewing Dr. Floro's report, he concluded Sparrow III died from hyperthermia. Dr. Dunton relied upon the fact that there were very few signs of asphyxiation. However, he did admit asphyxiation can never be conclusively ruled out because it can leave no signs at autopsy. Dr. Dunton admitted hyperthermia by itself should not cause petechiae, whereas asphyxiation could. However, he went on to explain that gravity will pull the blood down to the lowest point of the body when the heart stops pumping, causing the blood to pool to such a degree that venules rupture resulting in petechiae. He attributed the discoloration of the child's lips to the tissues drying out after death. Therefore, he concluded Dr. Floro erred in relying on the petechiae to diagnose the child's death as being caused by asphyxiation.

Based upon these facts the jury concluded Stephens was guilty of first-degree murder. The verdict form did not delineate between first-degree premeditated murder and first-degree felony murder.

*Stephens v. State*, 787 So. 2d 747, 750-52 (Fla. 2001) (per curiam) (*Stephens I*) (footnotes omitted). Stephens was convicted of one count of armed robbery and one count of first degree murder. The jury recommended by a nine to three vote that Stephens be sentenced to death for the murder of Robert Sparrow III. *Id.* at

5

752. In accordance with the jury's recommendation, the trial court sentenced Stephens to death for the first degree murder charge. Stephens had previously pled guilty to several other counts,[1] and the trial judge sentenced him to accompanying consecutive and concurrent terms of life on the robbery and kidnaping counts. *Id*. at 752-53.

On direct appeal, the Florida Supreme Court rejected Stephens' arguments, including his argument that his sentence was unlawful under *Tison* and *Enmund*, and affirmed Stephens' convictions and sentences. *Id.* at 753. Stephens subsequently filed a petition for writ of certiorari which was denied. *Stephens v. Florida*, 534 U.S. 1025 (2001).

Thereafter, Stephens filed a post-conviction motion in the state circuit court, and after an evidentiary hearing, the state court denied relief. Stephens appealed and simultaneously filed a state habeas petition to the Florida Supreme Court. On November 15, 2007, the Florida Supreme Court affirmed the denial of postconviction relief and denied the habeas petition. *Stephens v. State*, 975 So. 2d 405 (Fla. 2007) (per curiam) (*Stephens II*). Stephens filed a federal habeas petition which was denied on March 17, 2011.

---

[1] Prior to trial, Stephens pled guilty to one count of armed kidnaping, three counts of armed robbery, two counts of attempted robbery, one count of armed burglary and one count of aggravated battery.

## II. Standard of Review

This appeal is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. Because Stephens's claims were adjudicated on the merits in his state proceedings, § 2254(d) allows federal habeas relief only if the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). We review the district court's denial of a habeas petition *de novo*. *Harrell v. Butterworth*, 251 F.3d 926, 930 (11th Cir. 2001) (per curiam).

## III. Discussion

### A. Proportionality

Stephens argues that his death sentence is disproportionate under the Eighth Amendment because, at trial, the prosecution was not required to prove that he intentionally killed the victim. Rather, Stephens was convicted of first degree felony murder. The Cruel and Unusual Punishments Clause of the Eighth Amendment is directed, in part, "'against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.'" *Enmund*, 458 U.S. at 788 (quoting *Weems v. United States*, 217 U.S. 349, 371 (1910)). In

7

*Enmund*, the Supreme Court overturned a defendant's death sentence for felony murder because, in that case, there was "no finding of an intent to kill." *Enmund*, 458 U.S. at 795. In *Tison*, however, the Supreme Court qualified this holding, indicating that a death sentence for felony murder can be sustained where there is "major participation in the felony committed, combined with reckless indifference to human life." *Tison*, 481 U.S. at 158. The *Tison* court emphasized that "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime." 481 U.S. at 156. Thus, the relevant question before us is whether the Florida Supreme Court's finding that Stephens acted with the mental state, and level of involvement required by *Enmund* and *Tison*, was contrary to or an unreasonable application of clearly established federal law.

At the penalty phase of Stephens' trial, the trial judge submitted a form to the jury requiring it to answer, by way of advisory sentence, whether

> Stephens killed the victim, or attempted to kill the victim, or intended that the victim be killed, or that he played a significant role in the underlying felony and acted with reckless indifference to human life.

The jury answered the question in the affirmative, and was also polled following the announcement of the verdict. In accordance with the jury's determination and recommendation, the trial court sentenced Stephens to death on the first degree

8

murder count. The Florida Supreme Court concluded that the trial court's jury instructions made clear that the jury could not consider the death penalty as a possible punishment unless it unanimously found, beyond a reasonable doubt, that Stephens killed the victim, attempted to kill the victim, intended the victim to be killed or played a significant role in the underlying felony and acted with a reckless indifference to human life. The trial court's interrogatory, which mirrored the language of *Tison*, was specifically answered in the affirmative by the jury. We therefore cannot find that the Florida Supreme Court's application of clearly established federal law was unreasonable in this case.

## B. Ineffective Assistance at the Guilt Phase

Stephens next argues that during the guilt phase of trial, his trial counsel was ineffective for: (1) advising Stephens to plead guilty prior to trial to the underlying felony (armed kidnaping) of the felony murder charge; (2) advising Stephens to plead guilty prior to trial to the armed robbery of Derrick Dixon–when Dixon testified at trial that he had not been robbed–and then failing to file a motion to withdraw that guilty plea when the prosecution admitted this testimony should have resulted in a directed verdict; (3) failing to personally attend key depositions, instead of relying on the attendance of his co-defendant's counsel; (4) failing to move and argue for a change of venue based on prejudicial pretrial

9

publicity; (5) failing to object to numerous instances of improper conduct by the prosecutor at the guilt phase; (6) failing to adequately argue motions for judgment of acquittal and new trial; (7) delegating his responsibilities to co-defendant's counsel; and (8) failing to subject the prosecution's case to meaningful adversarial testing under *United States v. Cronic,* 466 U.S. 648 (1984).

We consider each of these claims under the test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To obtain relief on an ineffective assistance of counsel claim,

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

### (1) Counsel's advice to plead guilty to armed kidnaping

At Stephens' state post-conviction evidentiary hearing, the trial court found that Stephens' lawyer was deficient for advising Stephens to plead guilty to armed kidnaping because this was "not a reasonable strategy," and the Florida Supreme Court agreed. *Stephens II*, 975 So. 2d at 419. However, the Florida Supreme Court also found that Stephens could not demonstrate *Strickland* prejudice. In

10

order to show that counsel's deficiency prejudiced him, Stephens must show that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Stephens cannot meet this standard. The record reflects that the plea to the kidnaping charge was made knowingly and voluntarily. Furthermore, Stephens conceded his involvement in the kidnaping during his own testimony, admitting that he took the victim from the house. Counsel utilized Stephens' pleas in his argument at the penalty phase, arguing that the jury should consider them as evidence of Stephens' remorse and rehabilitation potential. Moreover, throughout the trial, counsel argued that Stephens did not *intentionally* kill the victim, which was the primary point of contention at trial.

We cannot say that the Florida Supreme Court's determination that Stephens failed to show that his counsel's deficient strategy prejudiced these proceedings was contrary to or an unreasonable application of clearly established federal law.

### (2) Counsel's advice to plead guilty to the armed robbery of Derrick Dixon

Likewise, Stephens argues that counsel was deficient for advising him to plead guilty to the armed robbery of Derrick Dixon, and subsequently failing to move to withdraw the guilty plea, because Dixon testified that nothing was taken

11

from him.   The Florida Supreme Court again determined that Stephens could not establish prejudice with respect to this claim:

> During the defense's case, Stephens admitted to robbing Derrick Dixon. He testified that he took $20 from Derrick Dixon, and when counsel asked him about Dixon's testimony that Stephens did not take anything from him, Stephens admitted that he did in fact take money from Dixon.
>
> Thus, Stephens fails to demonstrate that there is a reasonable probability that the outcome of the trial would have been different had counsel moved to withdraw the guilty plea to the charge of armed robbery. Accordingly, the trial court properly denied relief on this claim.

*Stephens II*, 975 So. 2d at 420.  Moreover, the robbery of Derrick Dixon was not prejudicial because it was insignificant in comparison to the overwhelming evidence that he robbed other individuals in the house and kidnaped the victim. We therefore cannot say that the Florida Supreme Court's resolution of this claim was contrary to or an unreasonable application of clearly established federal law.

*(3) Counsel's failure to personally attend key depositions*

The Florida Supreme Court found that counsel was deficient for failing to personally attend numerous critical depositions. *Stephens II*, 975 So. 2d at 418. However, Florida Supreme Court concluded that Stephens could not show prejudice because he failed to "demonstrate that, but for counsel's failure to attend

12

these depositions, there is a reasonable probability that the outcome of the trial would have been different." *Id.*

This conclusion is not contrary to or an unreasonable application of clearly established federal law. The Florida Supreme Court explained that the depositions were attended by co-defendant's counsel. Although we do not countenance the failure to personally attend important depositions, Stephens did not demonstrate before the Florida Supreme Court and does not demonstrate here how he was prejudiced by this failure.

### (4) Counsel's failure to move and argue for a change of venue due to abnormal pretrial publicity

Stephens next claims that his counsel was ineffective for failing to independently move for a change of venue, as opposed to relying on his co-defendant's motion, due to abnormal pretrial publicity. Stephens again cannot demonstrate prejudice. The Florida Supreme Court reasoned that Stephens "failed to allege facts indicating abnormal pretrial publicity." *Stephens I*, 787 So. 2d at 757. The court found that

> [T]he trial court went beyond the necessary precautions to ensure the jury selected was fair and impartial by conducting individual voir dire of the potential jurors to detect any potential juror who had been persuaded by the pretrial publicity. Out of the 115 potential jurors, the court leniently dismissed 40 potential jurors because it felt there was "some reasonable doubt" that they could be fair and impartial. Further, the court noted two-thirds of the potential jurors, including

13

all of the jurors who were ultimately selected to serve on the jury, stated they could be fair and impartial. Accordingly, the trial court acted within its discretion in denying the motion for a change of venue.

*Id.*, at 757-58. As the Supreme Court has noted,

> Our decisions have rightly set a high bar for allegations of juror prejudice due to pretrial publicity. News coverage of civil and criminal trials of public interest conveys to society at large how our justice system operates. And it is a premise of that system that jurors will set aside their preconceptions when they enter the courtroom and decide cases based on the evidence presented.

*Skilling v. United States*, 130 S. Ct. 2896, 2925 n.34 (2010) (citations omitted).

Stephens has not demonstrated that the jury was so tainted by pretrial publicity that they could not decide the case solely on the evidence and the judge's instructions. Indeed, the record demonstrates that the trial court went to great lengths to voir dire the jury with regard to the pretrial publicity of this case, and to insulate the jury from the taint of impartiality. Thus, we cannot say that the Florida Supreme Court's resolution of this claim is contrary to or an unreasonable application of clearly established federal law.

***(5) Failure to object to instances of improper conduct by the prosecutor at the guilt phase***

Stephens' claim that counsel was ineffective for failing to object to numerous instances of improper conduct by the prosecutor also fails. As the Florida Supreme Court explained

14

In order to prevail on an ineffective assistance of counsel claim on these grounds, Stephens must first show that the comments were improper or objectionable and that there was no tactical reason for failing to object. Secondly, Stephens must demonstrate that the comments deprived "the defendant of a fair and impartial trial, materially contribute[d] to the conviction, [were] so harmful or fundamentally tainted as to require a new trial, or [were] so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise." *Spencer v. State*, 645 So. 2d 377, 383 (Fla. 1994). The trial court found that none of the comments was so prejudicial that Stephens was denied a fair trial, and we agree. When read in context, these comments were not improper and did not deprive Stephens of a fair trial.

*Stephens II*, 975 So. 2d at 420 (alterations in original). The Florida Supreme Court determined that the comments of the prosecutor were not a sufficient basis to reverse the conviction. "Because the alleged comments were not improper, Stephens fails to show that he was prejudiced under *Strickland*." *Stephens II*, 975 So. 2d at 421. We cannot say that the state court's determination that Stephens was not prejudiced by counsel's lack of objection was unreasonable or contrary to clearly established federal law.

### (6) Failure to adequately argue motions for judgment of acquittal and new trial

Stephens argues that his trial counsel was ineffective for making a "bare bones" motion for a judgment of acquittal and motion for new trial, and therefore failed to preserve various arguments for Stephens' direct appeal. On direct appeal, the Florida Supreme Court did find that counsel had failed to preserve these

arguments. *Stephens I,* 787 So. 2d at 753 ("This claim was not preserved for appeal because Stephens' counsel made a bare bones motion for judgment of acquittal, without any specific argument."). However, the Florida Supreme Court went on to deny both motions on the merits, finding that there was "overwhelming" evidence of guilt, and that the "manifest weight of the evidence proves, at a minimum, that Stephens committed felony murder." *Stephens I*, 787 So. 2d at 754 ("This issue has not been properly preserved for appeal because Stephens' counsel made a bare bones motion for a new trial. . . . Moreover, even if this issue had been preserved for appeal, we would find no error because the claim is without merit."). On post-conviction review, the Florida Supreme Court determined that counsel's failure to more vigorously argue these motions did not prejudice Stephens because, on direct appeal, the Florida Supreme Court both acknowledged that the claims were unpreserved and denied them on the merits in any case. We cannot say that this conclusion was contrary to or an unreasonable application of clearly established federal law.

### *(7) Delegation of counsel's responsibilities to co-defendant's counsel*

Stephens argues that he his counsel was ineffective for delegating substantive duties to counsel for his co-defendant. Stephens makes a similar, separate argument, albeit on the same grounds, that counsel was *per se* ineffective

16

because he was operating under a conflict of interest: "because [Stephens] was actually represented by the attorney for codefendant Cummings and because Cummings' and Stephens' defenses were antagonistic, his right to conflict-free counsel was violated." *Stephens II*, 975 So. 2d at 422. Although Stephens frames this argument as two separate claims, we address them together here.

After a careful review of the record in this case, we conclude that the Florida Supreme Court was not unreasonable in concluding that Stephens' attorney was acting as his separate counsel, with only Stephens' interests in mind. Likewise, although Stephens' attorney failed to attend some key depositions, as noted above, and failed to object in certain instances, it is apparent from the record that Stephens' counsel was concerned only with Stephens' interests, and was not operating under a conflict of interest. The Florida Supreme Court's denial of these claims was therefore not contrary to or an unreasonable application of clearly established federal law.

*(8) Failure to subject the prosecution's case to meaningful adversarial testing*

In a related claim, Stephens asserts that the Florida Supreme Court should not have required him to show that he was prejudiced by counsel's alleged errors and should have instead applied the presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984) because counsel entirely failed to subject the

prosecution's case to a meaningful adversarial testing by (a) conceding the underlying felony, (b) laboring under an actual conflict of interest, and (c) failing to attend key depositions. This claim fails for the reasons already addressed. Stephens counsel argued throughout trial that Stephens was guilty of kidnaping and several other serious crimes, but argued that he was not guilty of capital murder. This "adversarial testing" is apparent throughout all phases of the trial. Likewise, as addressed above, counsel was not laboring under an actual conflict of interest, and was not constructively or actually absent from critical stages of the proceedings, with the exception of several depositions. Thus, the Florida Supreme Court properly required Stephens to demonstrate that he was prejudiced by counsel's alleged errors under *Strickland*.

**C. Ineffective Assistance of Counsel at the Penalty Phase**

Stephens argues that, in regard to the penalty phase, his counsel was ineffective by (1) failing to investigate and present certain mitigating evidence; (2) failing to neutralize his prior violent felony conviction; (3) failing to object to improper comments of the prosecutor during the penalty phase; (4) conceding various aggravating circumstances through guilty pleas; and (5) conceding various aggravating factors not found by the trial court during closing argument. We consider each in turn.

## *(1) Failure to investigate and present certain mitigating evidence*

At the penalty phase, Stephens' counsel presented ten witnesses to testify to Stephens' good qualities. Stephens argues, however, that counsel failed to adequately investigate other mitigating evidence. The Florida Supreme Court addressed this issue as follows:

> Counsel testified at the evidentiary hearing that his strategy was to humanize Stephens by calling family and friends to testify that Stephens was a loving person, that he had good relations with children, and that he took care of different children. This strategy was especially important because the case involved the death of a child. Counsel further testified that he was trying to get the jury to hear good things about Stephens in an attempt to get a life sentence. The record demonstrates that counsel did in fact call ten lay witnesses during the penalty phase. All ten witnesses testified that Stephens was a loving, cheerful, and bright person who came from a loving family and who was good with children.

> Stephens contends that counsel failed to discover many of the details that established compelling mitigation, such as his drug use, an incident where Stephens started a fire at a neighbor's house, and the accidental shooting of Stephens' brother. However, counsel testified that he did not consider these incidents as mitigation and that such information went against his strategy to portray Stephens as a "good guy."

*Stephens II,* 975 So. 2d at 414. A recent line of cases from this Court emphasizes the importance of penalty phase investigation, particularly where a defendant may have a prior history of mental illness or disability or a history of abuse and neglect in the home. For example, in *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008),

19

we held that, where the abuse experienced by a defendant far exceeds that which was presented at the penalty phase, counsel was deficient, and the defendant prejudiced, by counsel's failure to present the additional evidence.

Here, however, counsel's strategy was to omit all negative evidence about Stephens' childhood. There was evidence presented at the post-conviction phase regarding abuse that Stephens suffered at the hands of his father, that Stephens was a habitual drug user and had been using drugs on the day of Sparrow III's death, that he had accidentally set fire to his neighbor's house at the age of eight, and that he accidentally shot his brother. Under these circumstances, it was reasonable for counsel to conclude that failure to present such evidence would have undermined his "good guy" penalty phase strategy. Contrary to the circumstances of *Williams v. Allen*, where counsel failed to fully investigate the line of defense he actually pursued, and where the jury did not hear all of the mitigating evidence related to that specific defense, here, Stephens claims that counsel was ineffective for failing to present testimony that was opposite to, and would have entirely undermined, counsel's strategy. While counsel has a duty to investigate potentially mitigating circumstances,[2] pursuit of the "good guy"

---

[2] The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c) (1989), for example, provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." This includes

defense was reasonable in this case, and counsel may "reasonably decline to

investigate a line of defense thoroughly," where such investigation would lead

only to facts that would be harmful to the defense. *Chandler v. United States*, 218

F.3d 1305, 1318 (11th Cir. 2000) (*en banc*). The Florida Supreme Court's

conclusion that counsel was not deficient for failing to investigate these additional

circumstances was therefore not contrary to or an unreasonable application of

clearly established federal law.

Stephens' claim that counsel failed to consult and call mental health experts

as witnesses in mitigation of his crime likewise fails because it is unsupported by

the record:

> Counsel testified at the evidentiary hearing that he consulted two
> experts, Dr. Ernest Miller and Dr. Peter Knox. He further testified
> that he did not consult both experts just to know if Stephens was
> competent to stand trial or if Stephens was insane at the time of the
> crime, but also to see if they could help determine if there was any
> mental health mitigation. Counsel testified that after reviewing the
> reports of both experts, he believed the experts' conclusions were
> detrimental to Stephens and that it would not be in Stephens' best
> interest to present the findings.

---

investigating, where relevant, a defendant's school records, social service and welfare records,
juvenile dependency or family court records, medical history, criminal history, drug abuse
history, and employment history, and conducting a psychological evaluation. *Id.*

*Stephens II*, 975 So. 2d at 414. The trial court credited this testimony, and the Florida Supreme Court determined that this was sufficient to investigate Stephens' mental health for purposes of the guilt phase of his capital trial.

Additionally, at the evidentiary hearing, counsel testified that he had not wanted to call Dr. Miller because the state would have then been able to highlight several incidents contained in Dr. Miller's report, specifically the arson incident, the accidental shooting, and the fact that Stephens had been expelled from school for fighting. Counsel testified that he did not want the jury to hear about these facts because he believed that they were adverse to counsel's "good guy" defense strategy. Similarly, Dr. Knox's report indicated that Stephens may have suffered from an anti-social personality disorder. At the evidentiary hearing, counsel told the court that he did not consider such evidence as mitigation evidence, and that "I don't ever want the jury to hear that."

During the evidentiary hearing, the trial court heard the testimony of a third mental health expert, Dr. Jethrow Toomer, who claimed that he could have made further findings regarding Stephens' mental health and presented these to the jury. However, because Dr. Toomer testified that Stephens' mental health issues were based on low IQ and a troubled family upbringing, the Florida Supreme Court found that

22

. . . Dr. Toomer's findings would have been damaging to the "good guy" image that counsel was attempting to portray. Counsel cannot be deemed ineffective when he made a strategic decision to focus on the positive aspects of Stephens' life instead of seeking a third opinion.

*Stephens II*, 975 So. 2d at 415. *See also Haliburton v. Sec'y for Dep't of Corr.*, 342 F.3d 1233, 1244-45 (11th Cir. 2003) (concluding that counsel's decision to humanize the defendant through lay testimony rather than call a mental health expert who might have hurt the defense was not deficient performance).  We therefore cannot say that the Florida Supreme Court's resolution of this claim was contrary to or an unreasonable application of clearly established federal law.

### *(2) Failure to neutralize Stephens' prior violent felony conviction*

Stephens also contends that counsel was ineffective for failing to challenge or neutralize a 1992 burglary conviction that the State introduced as a prior violent felony aggravator.  The Florida Supreme Court found that counsel did, in fact, conduct discovery with respect to the prior violent felony aggravator, but made the strategic decision not to call a neutralizing witness, because he did not want to draw further attention to the incident:

> With regard to the failure to neutralize the burglary conviction as an aggravator, counsel testified at the evidentiary hearing that he deposed Latonya Jackson, the victim of the burglary, and looked at the police reports of the burglary conviction and understood that there was damaging information about it.  Counsel testified that he knew that even if he objected to the introduction of the aggravator, the burglary conviction was nonetheless going to come in.  As a result,

23

counsel made a strategic decision not to focus on introducing evidence to possibly lessen the weight of the aggravator because he believed it could backfire.

*Stephens II*, 975 So. 2d at 415. Because counsel made a strategic decision not to present this evidence, we cannot find that the Florida Supreme Court's resolution of this claim was contrary to or an unreasonable application of clearly established federal law.

### (3) Failure to object to improper comments of the prosecutor during the penalty phase

Stephens alleges trial counsel was ineffective for failing to object to portions of the prosecutor's argument in which he discussed the State's victim impact evidence, described Stephens's actions as transforming the victim from a happy little boy into a corpse, appealed to the jury's sympathy, and showed the jury photos of the victim that had been admitted into evidence. As the Florida Supreme Court explained, "[c]ounsel is not ineffective for making a tactical decision not to object to statements and photographs introduced during the State's closing arguments when those statements and photographs were not improper." *Stephens II*, 975 So. 2d at 416-17. At the evidentiary hearing, counsel testified that he did not find anything objectionable about the prosecutor's comments, and that as a defense attorney you have to "pick your fights carefully" or risk "alienating" the jury. We therefore cannot find that the Florida Supreme Court's

24

resolution of this claim was contrary to or an unreasonable application of clearly established federal.

*(4) Conceding various aggravating circumstances through guilty pleas.*

Stephens argues that counsel was ineffective for advising him to plead guilty to certain crimes that constituted aggravating circumstances. As discussed above, in *Hill v. Lockhart*, the Supreme Court held that when a defendant challenges his guilty pleas based on ineffective assistance of counsel, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. at 59. Stephens cannot meet this standard. As the Florida Supreme Court points out:

> Penalty phase counsel . . . testified that lead counsel's strategy was to gain credibility with the jury and that this strategy worked because entering guilty pleas on certain charges resulted in an acquittal of some of the charges for which Stephens pled not guilty. During the penalty phase, counsel even stated during his closing arguments that the fact that Stephens pled guilty to a number of charges should be seen as mitigation. In fact, in its sentencing order, the trial court found in mitigation that Stephens entered pleas to some counts of the indictment.
>
> Counsel is not deemed ineffective for using a strategy that benefited Stephens. Stephens fails to show that counsel was deficient under *Strickland*.

*Stephens II*, 975 So. 2d at 418 (internal citation omitted). We cannot find that the Florida Supreme Court's resolution of this claim was contrary to or an unreasonable application of clearly established federal law.

***(5) Conceding various aggravating factors not found by the trial court during closing argument***

Stephens further argues that counsel conceded certain aggravators in his closing statement. However, the Florida Supreme Court found that this was not the case:

> Stephens alleges that counsel conceded both the heinous, atrocious, or cruel (HAC) aggravator and the pecuniary gain aggravator to the jury during his closing argument. Stephens is mistaken as counsel did not concede either aggravator. With regard to the pecuniary gain aggravator, counsel explained to the jury that the aggravator should be merged with the murder "in the course of a felony" aggravator. Counsel explained that because Stephens had been convicted of robbery, which was one of the enumerated felonies recognized for the aggravating circumstance of murder "in the course of a felony," the crime was for financial gain, and as a result, the two aggravators should merge.

> With regard to the HAC aggravator, counsel attempted to emphasize to the jury that the State had not proven the aggravator beyond a reasonable doubt. Counsel stated to the jury that they should give very little weight to the HAC aggravator because none of the medical testimonies demonstrated that Little Rob suffered from a prolonged, agonizing kind of death, which is necessary for the HAC aggravator to apply. Counsel also stated that there was no proof of enjoyment of punishment or some kind of pleasure in making Little Rob suffer the way he did.

26

*Stephens II*, 975 So. 2d at 417. Based on this record, Stephens fails to demonstrate that counsel was deficient under *Strickland*. Furthermore, Stephens cannot show prejudice because, as he himself points out, the trial court did not find that either the financial gain or the HAC aggravator was proven beyond a reasonable doubt, and therefore did not give weight to these aggravators in sentencing Stephens to death. We cannot find that the Florida Supreme Court's resolution of this claim was contrary to or an unreasonable application of clearly established federal law.

### III. Conclusion

In denying Stephens' claim for relief, we echo the district court's concerns about this case:

> This is a close death penalty case, as evidenced by the 4-3 decision of the Florida Supreme Court on the direct appeal. The imposition of the death penalty was not based upon a finding that Petitioner intended to murder the child victim. Instead, it was predicated upon a finding that he played a major role in the underlying felony and acted with reckless indifference to the child's life. Under the highly deferential standard for federal habeas review of state court adjudications, *see* 28 U.S.C. § 2254(d), this Court concludes that the Florida Supreme Court's adjudication of this *Tison/Enmund* issue was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.
>
> Additionally, this Court has serious misgivings about Petitioner's counsel's failure to attend depositions, failure to advocate more thoroughly on his client's behalf and his advising Petitioner to

27

plead guilty to the kidnapping that was the underlying felony under the felony murder theory. Counsel representing a defendant in a capital case owe their client and our system of justice better. However, this Court must evaluate Petitioner's ineffective assistance of counsel claims "[u]nder the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." [*Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)]. Here, the state circuit court thoroughly addressed and rejected Petitioner's ineffectiveness claims after conducting an evidentiary hearing. Thereafter, the Florida Supreme Court reviewed in detail the same ineffectiveness issues and found that Petitioner is not entitled to post-conviction relief.

*Stephens v. McNeil*, No. 3:08-cv-260-J-32JRK (March 17, 2011), at 51-52.

However, because the Florida Supreme Court's resolution of this case was not contrary to or an unreasonable application of clearly established federal law, Stephens' habeas petition is denied.

**AFFIRMED.**