921 So.2d 38 (2006)
Miguel WAGNER, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-1564.
District Court of Appeal of Florida, Fourth District.
January 25, 2006.
Rehearing Denied March 17, 2006.
*39 Carey Haughwout, Public Defender, and Michael Antinori, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Mark J. Hamel, Assistant Attorney General, West Palm Beach, for appellee.
PER CURIAM.
A jury found Miguel Wagner guilty of second degree murder, robbery with a firearm, and five counts of aggravated assault with a firearm while wearing a mask. We reverse the second degree murder conviction and affirm the others.
The second degree murder charge in this case arose out of an armed robbery gone bad. Appellant and his partner, Chris Pucci (Pucci), donned masks and, armed with a machine gun and a revolver, robbed a consignment store. As they fled the scene, they were pursued by Deputy Frank Wear. The chase ended with Pucci being shot and killed by Deputy Wear. At trial, appellant's defense to the murder charge was that Pucci was suicidal and forced his own death at the hands of the police officer.
Deputy Wear described the chase. He testified that he followed the van, which was being driven by Pucci, as it traveled down Powerline Road and made two turns down side streets. When the van suddenly stopped, Deputy Wear stopped behind it. The van then made a U-turn and, as it turned, Pucci pointed a machine gun at the deputy. Seeing the gun pointed at him, Deputy Wear gunned his accelerator and slammed into the van. He then quickly exited his vehicle, turned and fired three rounds into the van's driver's side door, and ran away.
Appellant got out of the van and ran away. Pucci exited and ran alongside the van as Deputy Wear yelled for him to drop his weapon. When Pucci turned towards Deputy Wear and pointed his weapon, Deputy Wear fired again, striking Pucci. Pucci fell forward and, as Deputy Wear emerged from behind his vehicle, he saw Pucci lying in the bushes by the sidewalk holding the machine gun by his side, moving slightly as if trying to roll over. Deputy Wear approached Pucci and directed him to drop his weapon. When Pucci did not do so, Deputy Wear fired several more rounds at Pucci, killing him.
Pucci's girlfriend, Mitzi Turner (Turner), also testified at trial. She stated that Pucci had spent the night at her home on the evening prior to the robbery and, during the day, recorded a video which he left with a note telling Turner to watch the video. According to Turner, Pucci was upset over having to turn himself in to jail for a parole violation and told her that he would die before he went back to jail. Turner said that Pucci had attempted suicide *40 eight years before and appeared to be "going off a cliff."
On cross-examination, appellant sought to question Turner about the video, but the court would not allow such questioning, finding it to be outside the scope of the state's direct examination of the witness. In addition, the court ruled that any probative value was outweighed by prejudice and confusion and that none of the testimony concerning Pucci's video was relevant to any issue in the case.
Appellant proffered the video, arguing that it was relevant to the issue of whether Pucci's death occurred as a consequence of and during the commission of the crime. Counsel argued that it was for the jury to determine whether, at the time Pucci turned the van around and pointed the machine gun at the officer without firing, and then again, when he exited the van and pointed the weapon at the officer without firing, the commission of the robbery had ended and Pucci was acting independently to commit his suicide. The court denied the request and excluded the evidence, ruling that it was inadmissible because "Mr. Pucci's state of mind prior to robbery is not relevant to any issue of this case."
In the video, Pucci, who was crying, spoke to Turner and the rest of his family. He told them he loved them and apologized for having disappointed them throughout his life. He said that he was about to do something "retarded," that he felt he would never get things right in his life, and that he would see them in heaven. He stated that "today is do or die" and then directed that his personal effects be distributed to his nieces and to Turner's boys. He apologized for failing everyone.
In addition, citing potential juror confusion, the court denied appellant's request to call as an expert a doctor who would give his opinion on "suicide by cop." Further, while the court allowed defense counsel to argue that Pucci's death was a "suicide-by-cop" situation, the court denied appellant's request for an independent act jury instruction. On appeal, appellant argues that the court denied him the right to present his defense to the murder charge by excluding all evidence which would have supported that defense and by denying his request for an independent act jury instruction. We agree.
A defendant has a constitutional right to present a defense. See generally Casseus v. State, 902 So.2d 294 (Fla. 4th DCA 2005). The trial court must protect that right when considering whether to exclude evidence. Id. at 296. Although some evidentiary rulings are reviewed under the relevancy standard, other considerations must also be taken into account. See Neiner v. State, 875 So.2d 699, 700 (Fla. 4th DCA 2004). What is relevant to show a reasonable doubt may differ from what is relevant to show the commission of the crime itself. Id. (citing Vannier v. State, 714 So.2d 470, 472 (Fla. 4th DCA 1998)). "Where evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant's guilt, it is error to deny its admission." Id. (quoting Rivera v. State, 561 So.2d 536, 539 (Fla.1990)).
Section 782.04(2)d, Florida Statutes, states that the killing of a human being, which occurs while a defendant is "engaged in the perpetration of" a robbery is murder in the first degree, or felony murder. "The term `in the perpetration of' includes the period of time when a robber is attempting to escape from the scene of the crime." Parker v. State, 570 So.2d 1048, 1051 (Fla. 1st DCA 1990)(citing Hornbeck v. State, 77 So.2d 876 (Fla. 1955)). Absent some "definitive break in the chain of circumstances beginning with the felony and ending with the killing, the *41 felony, although technically complete, is said to continue to the time of the killing." Id. (quoting Mills v. State, 407 So.2d 218, 221 (Fla. 3d DCA 1981)). The State must prove that there was no break in the chain of circumstances beginning with the felony and ending with the murder. Santiago v. State, 874 So.2d 617, 621 (Fla. 5th DCA 2004).
Factors such as "the relationship between the underlying felony and the homicide in point of time, place and causal relationship" are important in determining whether there was a break in the chain of circumstances. Id. In the case of flight, an important consideration "is whether the fleeing felon has reached a `place of temporary safety.'" Id. (quoting LaFave, Substantive Criminal Law § 7.5 (1986)); accord State v. Williams, 776 So.2d 1066, 1070 (Fla. 4th DCA 2001). If the killing is "a predictable result of the felonious transaction," "[n]either the passage of time nor separation in space from the felonious act to the killing precludes a felony murder conviction." Stephens v. State, 787 So.2d 747, 757 (Fla.2001)(citing Campbell v. State, 227 So.2d 873 (Fla.1969)).
In Ray v. State, 755 So.2d 604, 609 (Fla.2000), the supreme court explained:
The "independent act" doctrine arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, "which fall outside of, and are foreign to, the common design of the original collaboration." Dell v. State, 661 So.2d 1305, 1306 (Fla. 3d DCA 1995) (quoting Ward v. State, 568 So.2d 452 (Fla. 3d DCA 1990)). Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act. Id. See also Parker v. State, 458 So.2d 750 (Fla.1984). Where, however, the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion, no independent act instruction is appropriate. [citations omitted].
In this case, appellant sought an independent act instruction based on Pucci's actions during the flight and the fact that appellant fled the scene entirely. "Where there is any evidence introduced at trial which supports the theory of the defense, a defendant is entitled to have the jury instructed on the law applicable to his theory of defense when he so requests." Bryant v. State, 412 So.2d 347, 350 (Fla.1982)(holding that defendant who participated in robbery was entitled to an independent act instruction where evidence indicated that homicide occurred after he had left the scene and in the course of cofelon's commission of a sexual battery that was not part of their common scheme); Rodriguez v. State, 571 So.2d 1356 (Fla. 2d DCA 1990) (holding that defendant was entitled to an independent act instruction where murder was committed by cofelon after defendant had exited the store, and the defense theory was that the murder was a spiteful act of the cofelon as an afterthought to the attempted robbery). The independent act instruction should not be given if the evidence shows that the murder was committed in furtherance of the felonious scheme. See Thomas v. State, 787 So.2d 27, 29 (Fla. 2d DCA 2001).
In Thomas, the facts were that Thomas and two other people planned to rob a night manager of a convenience store. Thomas and one of the others, Miller, testified that they intended to use non-lethal force. During the robbery, they discovered that their accomplice had a weapon; therefore, Thomas and Miller "immediately withdrew from the undertaking and attempted, albeit ineffectively, to call the whole thing off." Id. at 29-30. The accomplice carried out the robbery and shot *42 the clerk in the head. Id. Thomas was convicted of felony murder and appealed the trial court's denial of his request for an independent act jury instruction. Id. at 28.
On appeal, the court noted that the evidence lent itself to two possible interpretations. One was that, although Thomas intended to rob the clerk, the plan in which he was involved did not involve lethal force and the accomplice's act of shooting the victim was independent of the plan. Id. The second possible interpretation was that the accomplice shot the clerk in furtherance of the robbery scheme (i.e., to eliminate eyewitnesses). Id. Since the facts in the case did not "fall neatly within either scenario," the appellate court held that Thomas was entitled to an independent act jury instruction and reversed the conviction for a new trial. Id.
In this case, the trial court denied appellant's requests to introduce evidence and give a jury instruction which would support his theory of "suicide by cop." The court's decision was based on the authority which states that the commission of the felony continues through the time of the flight. Thus, the court ruled that the video and anything tending to show Pucci's state of mind was irrelevant and did not consider the independent act argument. The result of the trial court's rulings was that appellant was denied the opportunity to present his "suicide-by-cop" defense which was based on a theory that Pucci deviated from the common plan of robbery and acted independently in forcing his suicide.
While the evidence certainly could support a conclusion that Pucci's death occurred while he was engaged in the perpetration of the felony (i.e., flight) and there was no break in the chain of circumstances, the jury could also have found otherwise. Had the jury viewed the video in which Pucci foretold a "do or die" situation, made arrangements for the disposal of his personal property, and spoke of reuniting with his loved ones in heaven, they might have concluded that Pucci intended to die if the robbery did not go as planned. Such a conclusion would also have been supported by the additional evidence that Pucci was facing a return to prison as a result of a violation of parole and vowed to die before going back to prison.
Under the facts presented in this case, appellant should have been allowed to present evidence to support his theory that Pucci was not in the process of fleeing, but rather was taunting the officer to fire a fatal shot. The officer testified that, during the chase, Pucci stopped the vehicle. The officer thought that Pucci might be surrendering, but then the van made a U-turn and Pucci pointed his weapon directly at the officer, but did not fire it. After exiting the van, Pucci, again, pointed his weapon at the officer, but did not fire it. Had the jury heard evidence of Pucci's state of mind on the day of the crime, they might have concluded that Pucci had, indeed, planned a suicide at the hands of the officer, an act which was separate and distinct from the common scheme to commit a robbery. In any case, appellant certainly had a right to present this theory for the jury's consideration and have the jury at least consider the possibility of an independent act.
We, therefore, reverse the conviction for second degree murder and remand for a new trial. We affirm all other convictions and issues raised in this appeal.
Reversed and Remanded.
STEVENSON, C.J., POLEN and SHAHOOD, JJ., concur.