CIKLIN, J.
Victor Salastier Diaz Estevez (“Diaz”) appeals his conviction and sentence for first-degree felony murder. Diaz was tried with a codefendant, Roger Rodriguez (“Rodriguez”), in a trial with separate juries. Diaz contends that the state was collaterally estopped from prosecuting the first-degree felony murder charge because a previous jury acquitted him of actually murdering the victim and of the attempted felony murder of a different person. We disagree because a rational jury could have *637 acquitted Diaz of the actual murder of the victim and the attempted felony murder of another individual but still find Diaz guilty of first-degree felony murder because the previous acquittals did not foreclose the factual predicate necessary for the felony murder conviction.
Diaz also contends that the trial court reversibly erred when it allowed his jury to be present for the testimony of Rodriguez because Rodriguez accused Diaz of committing crimes for which Diaz had already been acquitted in the earlier trial. We agree with this argument and reverse and remand the case for a new trial.
Facts
By indictment, the state charged Diaz and five codefendants, including Rodriguez, with thirteen counts arising from a robbery and the attempted escape from the robbery: first-degree murder of Samuel Salomon with a firearm (count I), attempted first-degree murder of Sian Koh with a firearm (count II), attempted felony murder of Sian Koh with a firearm (count III), burglary with an assault or battery with a firearm (count IV), four counts of robbery with a firearm (counts V, VI, VII, and VIII), two counts of kidnapping with a firearm (counts IX and X), shooting into a building (count XI), shooting into an occupied vehicle (count XII), and discharging a firearm from a vehicle (count XIII). The court granted Diaz’s motion for severance and ordered, among other things, that Diaz and Rodriguez have separate trials, although the court did not preclude a “joint trial” with dual juries.[1]
The First Trial
The case against Diaz proceeded to a first jury trial. In the first trial, Diaz was tried with a codefendant, Luis Alfonso Reyes Castillo, with separate juries. The state presented evidence that Diaz, Castillo, Rodriguez, and other codefendants robbed a convenience and check-cashing store in Boynton Beach. After the code-fendants left the store in a car, the store’s manager, Sian Koh, followed the codefen-dants in his own car. Koh called 911 on his cell phone, reported the robbery, and relayed the codefendants’ movements to the 911 operator. Koh followed the code-fendants on Boynton Beach Boulevard and followed the codefendants’ car onto the southbound lanes of the Florida Turnpike.
The codefendants exited the turnpike at Atlantic Avenue. One of the codefendants then fired a gun at Koh. One bullet struck Koh’s car, but not Koh himself. Another bullet entered an occupied home, but fortunately that bullet also did not strike anyone. Tragically, another bullet struck Samuel Salomon who was driving on Atlantic Avenue. Mr. Salomon’s wife was sitting in the passenger seat when the stray bullet tore through her husband’s chest. Samuel Salomon died as a result of the gunshot wound.
The codefendants then re-entered the turnpike and continued south, and Koh continued to follow them. The codefen-dants exited the turnpike again at Glades Road, at which point Diaz, Castillo, and Rodriguez were apprehended.
After the state rested its case, the court granted Diaz’s motion for judgment of acquittal on the premeditated murder theory for count I, the first-degree murder of Samuel Salomon. The state then proceeded with a charge of first-degree felony murder for count I. Among other defenses, Diaz argued that he was not guilty on the grounds that the murder did not occur *638 during his escape from the scene of the robbery.[2]
At the conclusion of the trial, the jury found Diaz not guilty for counts II and III (attempted murder and attempted felony murder of Sian Koh), count XI (shooting into a building), count XII (shooting into an occupied vehicle), and count XIII (discharging a firearm from a vehicle). The jury found Diaz guilty of burglary with assault or battery while armed (count IV), three counts of robbery with a firearm (counts V, VI, and VII), and two counts of false imprisonment (lesser included offenses of counts IX and X).[3]
As to count I, the first-degree felony murder of Samuel Salomon, the jury deadlocked. The court declared a mistrial as to that count. The court adjudicated Diaz guilty on the counts resulting in convictions and sentenced Diaz to a combined total of fifty-three years in prison.
Castillo’s jury found him guilty of all thirteen counts as charged in the indictment. During the penalty phase, the state argued that Castillo was “the defendant who was sitting in the shooter’s seat, who was sitting in the seat that the shots were fired from.” The state’s argument clearly suggested that it was Castillo who fired the shot that killed Mr. Salomon — and not Diaz or Rodriguez. The court sentenced Castillo to life in prison.
The Second Trial
After the jury rendered its verdict following the first trial, Diaz moved to dismiss the first-degree felony murder count, arguing that the jury’s verdicts in the first trial showed that the jury necessarily concluded the murder did not occur during the escape from the robbery scene. The court denied the motion, and the case proceeded to a second jury trial. In the second trial, Diaz was tried with another codefendant, Rodriguez, again with separate juries for each codefendant.
In the second trial, Diaz conceded that he was involved in the underlying robbery and that Samuel Salomon was dead. Diaz’s defense was that there was a “break in the chain of circumstances”[4] between the robbery and the murder of Mr. Salo-mon and further that Diaz did not actually murder Salomon; thus Diaz, argued, he could not be guilty of felony murder.
*639 In addition to the evidence adduced at the first trial, the state elicited the testimony of an off-duty police officer who saw the codefendants driving recklessly on Boynton Beach Boulevard and the Turnpike. Outside the presence of the Diaz jury, the state presented a video recording of Rodriguez’s interview -with the police following his capture. Rodriguez admitted his involvement in the crime and claimed that Diaz actually fired the shots that killed Salomon, hit Koh’s vehicle, and hit the occupied home.
After the state rested its case against Diaz, Diaz moved for a judgment of acquittal on the collateral estoppel issue, which the court again denied. Diaz chose not to testify and rested without presenting any witnesses or evidence.
At the close of trial for the day, Rodriguez announced his intention to testify.[5] The state argued that both Diaz’s jury and Rodriguez’s jury should be present for the testimony. Diaz objected on several grounds. Most importantly, Diaz argued that Rodriguez would undoubtedly testify that it was Diaz who actually fired the shots that killed Mr. Salomon which would be improper because the jury in the first trial had acquitted Diaz of those precise charges. The state conceded that it was barred from eliciting testimony that Diaz was the actual shooter,[6] but argued that Diaz’s jury should nevertheless be allowed to hear Rodriguez accuse him of the crime. Diaz argued it was “fundamentally unfair” to allow his jury to hear testimonial evidence from a codefendant that the state itself was barred from introducing. Diaz filed a written motion arguing that allowing the Diaz jury to be present during Rodriguez’s testimony would, in effect, improperly revoke the severance order in the middle of trial because it would allow the Diaz jury to hear evidence that was only admissible against Rodriguez. Diaz also argued that it was improper for a “third party,” Rodriguez, to testify against Diaz.
After a lengthy discussion of the issue, the court ultimately overruled Diaz’s objections and both the Diaz and Rodriguez juries were present in the courtroom for Rodriguez’s testimony. The court also denied Diaz’s motions to preclude Rodriguez from testifying that Diaz was the actual shooter.
During his direct examination, Rodriguez did in fact testify that Diaz fired the shots that killed Mr. Salomon. Before the state cross-examined Rodriguez, the attorneys went sidebar and the prosecutor inquired of the court as to whether the state was allowed to impeach Rodriguez with prior inconsistent statements made in his pretrial statement to the police. Diaz’s counsel again objected, arguing that allowing the Diaz jury to be present would result in the jurors “hearing] all sorts of stuff that they wouldn’t hear if these trials were separate.” The court overruled Diaz’s objection.
Thereupon, the state questioned Rodriguez regarding the attempted escape from the robbery scene. Rodriguez initially stated that the codefendants believed they had escaped from the crime scene until they noticed Koh’s vehicle pursuing them on the Turnpike. Upon further question *640 ing, Rodriguez admitted that he had earlier stated the codefendants knew Koh was following them before they entered the Turnpike. Rodriguez then stated that he did not know when the group in the getaway vehicle noticed Koh’s car following them. The state elicited testimony about the shooting, but the state did not ask Rodriguez to identify the shooter. Diaz’s counsel also cross-examined Rodriguez.
In closing arguments before Diaz’s jury, the state focused primarily on the testimony of Koh and the off-duty police officer to argue that Diaz’s escape had not concluded before Mr. Salomon was murdered. The state conceded that there was a “reasonable doubt” regarding the identity of the actual shooter, but the state argued that “it does not matter who pulled that trigger” for the purpose of finding Diaz guilty of felony murder.
The jury found Diaz guilty of first-degree felony murder. The court adjudicated Diaz guilty and sentenced him to life in prison. Diaz appeals his judgment and sentence.
Collateral Estoppel
Collateral estoppel “means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.” Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). “The principle precludes the government from relitigating certain facts in order to establish the fact of the crime, which includes a redetermination of evi-dentiary facts as well as ultimate facts.” Jones v. State, 120 So.3d 135, 138 (Fla. 4th DCA 2013) (citations omitted). The collateral estoppel principle may preclude argumentation of facts “necessarily established” in a prior proceeding, and “[a] necessarily established fact has been held to be one which has been resolved in favor of the defendant at the prior trial and was essential to the conviction in said case.” Id. (citation omitted).
Diaz argues that the state was collaterally estopped from prosecuting the first-degree felony murder count after he was acquitted of the attempted felony murder of Koh in the first trial. Diaz argues that, under the facts of this case, the state was required to prove that Mr. Salomon’s murder occurred during the escape from the robbery to support a first-degree felony murder conviction. Diaz contends that by acquitting Diaz of the attempted felony murder of Koh, the jury necessarily determined that Diaz and the others had reached a temporary place of safety, and thus were no longer escaping the scene of the robbery, before the attempted murder of Koh occurred. The shots that were aimed at Koh actually killed Mr. Salomon, and Diaz argues that the state was foreclosed from arguing his murder occurred during the perpetration of the robbery in the second trial because the escape issue had already been decided in Diaz’s favor by the jury in the first trial.
After reviewing the record of the first trial, we disagree with Diaz. A rational jury could have determined that Diaz was not guilty of the attempted felony murder of Koh without deciding the escape issue, because attempted felony murder requires an intentional act in addition to the underlying felony. The crime of attempted felony murder is defined by statute: “Any person who perpetrates or attempts to perpetrate any felony enumerated in s. 782.04(3) and who commits, aids, or abets an intentional act that is not an essential element of the felony and that could, but does not, cause the death of another commits a felony of the first degree .... ” § 782.051(1), Fla. Stat. (2007). Therefore, unlike felony murder, attempted felony murder requires that the defendant com *641 mit, aid, or abet in “an intentional act that is not an essential element of the [underlying] felony.” Id.
In the first trial, while the jury convicted Diaz of the underlying robbery charges, the jury acquitted Diaz of actually firing the shots that killed Mr. Salomon, either as the actual shooter or under a theory of principals. The verdict indicates that the jury concluded the state had not proven beyond a reasonable doubt that Diaz committed, aided, or abetted in the actual firing of the shots aimed at Koh that killed Salomon. Nonetheless, the jury could have rationally based its acquittal on the attempted felony murder charge on the grounds that Diaz did not “commit, aid, or abet” in the actual shooting — not on the issue of whether the murder occurred during the escape from the robbery scene.
The jury’s verdicts in the first trial indicate the jury deadlocked on the precise issue Diaz claims the jury necessarily decided: whether the murder occurred during the escape from the robbery. First-degree felony murder is the unlawful killing of a human being when committed by a person engaged in the perpetration or attempted perpetration of enumerated crimes, including robbery. See § 782.04(l)(a)2„ Fla. Stat. (2007). Crucially, a defendant can properly be found guilty of felony murder because the defendant participated in the underlying felony and the murder occurred during the commission or escape from the underlying felony, even if the defendant did not commit the actual murder. See Hodge v. State, 970 So.2d 923, 927 (Fla. 4th DCA 2008) (“The focus in a felony murder charge is not on the accused’s participation in the murder but in the underlying felony. Because the victim was killed during the robbery in which [the defendant] participated, it matters not whether [the defendant] was the perpetrator of the shooting or merely participated in the robbery.” (citations omitted)); see also Ray v. State, 755 So.2d 604, 609 (Fla.2000) (“As we have previously held, the term ‘during the course of a robbery’ encompasses the period of time when the felons are in flight from the scene of the crime.” (citation omitted)).
In the first trial, the jury found Diaz guilty of participating in the underlying felony, thus the only disputed issue of the felony murder charge was whether the murder of Mr. Salomon occurred during the commission of the felony. Because the jury deadlocked on the felony murder charge but reached a verdict on the attempted felony murder charge, we conclude the logical explanation of the jury’s verdict is that the jury could not decide whether the murder occurred during the escape from the robbery, but the jury did decide that Diaz did not commit, aid, or abet in the intentional act of shooting at Koh. Accordingly, the trial court properly concluded that Diaz could not foreclose the escape issue from the jury’s consideration in the second trial. See Ferguson v. State, 946 So.2d 553, 554 (Fla. 4th DCA 2006) (“[Collateral estoppel does not apply if the verdict could be grounded upon an issue other than that which the defendant seeks to foreclose from consideration.” (citation and quotation marks omitted)).
Codefendant’s Testimony
We turn now to the second issue of this appeal: whether the trial court reversibly erred by allowing Diaz’s codefendant, Rodriguez, to testify in the presence of the Diaz jury. We begin with a discussion of the use of multiple juries.
Florida law allows for multiple juries as “a useful exercise in judicial economy.” Velez v. State, 596 So.2d 1197, 1199 (Fla. 3d DCA 1992). “The multiple jury procedure was designed to avoid Bruton problems and other general problems of *642 prejudice that arise from joint trials.”[7] Id. (citation and footnote omitted).
To the extent possible, we seek to avoid interfering in a trial court’s exercise of discretion regarding the procedural aspects of trials. See id. at 1200 (“A trial judge has very broad discretion in the procedural conduct of trials. In the absence of demonstrated prejudice, we are loathe to disapprove the novel procedure [dual juries] employed sub judice.” (citation omitted)). We do not wish to impede the development of innovative trial procedures that could potentially conserve judicial resources and lessen the personal burden for everyone connected to the process. See id. (“[T]he law is, and must be, dynamic and not static. Procedural law is no exception. Experience comes about as a result of experiment.” (citation omitted)).
Nevertheless, we must caution trial courts that “the use of dual juries is rife with the potential for error or prejudice.” Id. (citation omitted and emphasis removed). “Cases approving the use of multiple juries have commended the system for furthering judicial economy but have cautioned that a trial judge must take great care to insure that each jury hears evidence relevant only to its defendant.” Watson v. State, 633 So.2d 525, 525 (Fla. 2d DCA 1994) (citations omitted). As a New Mexico court analyzing the multiple juries procedure noted:
[W]e caution trial courts to bear in mind that the dual-jury procedure has the potential for engendering error, especially in complex cases, and requires great diligence on the part of the trial judge and cooperation of the attorneys to take the precautions necessary to ensure due process throughout the joint trial.
State v. Padilla, 125 N.M. 665, 964 P.2d 829, 834 (Ct.App.1998) (citations omitted).
Turning to the facts of this case, we hold that the trial court erred by allowing the Diaz jury to hear Rodriguez testify because Rodriguez gave testimony which would have not been admissible if Diaz and Rodriguez had completely severed trials. See People v. Cummings, 4 Cal.4th 1233, 18 Cal.Rptr.2d 796, 850 P.2d 1, 34-36 (1993) (stating that a defendant’s right to due process may be violated when use of separate juries allows otherwise inadmissible evidence to be introduced against a defendant, if such evidence results in “identifiable prejudice or gross unfairness” to the defendant) (citations and quotation marks omitted); cf. Minor v. State, 763 So.2d 1169, 1170 (Fla. 4th DCA 2000) (“While appellant argues that [the dual jury procedure] was error because of the antagonistic defenses, he fails to point to any place in the record where he objected to evidence or testimony that was heard by his jury as a result of the dual jury process which he now claims should not have been admitted in his case.”). To its credit, the state conceded that it could not argue that Diaz actually fired the shots that killed Mr. Salomon, but Rodriguez, in fact, gave this exact testimony. In effect, permitting the Diaz jury to hear Rodriguez’s testimony allowed Diaz to be directly and prejudi-cially accused of crimes for which he had already been acquitted.
Indeed, the Second District determined that it was error to allow a defendant’s *643 jury to be present during the codefen-dant’s presentation of witness testimony when the witness testified against the defendant. Watson, 633 So.2d at 525-26. In that case, Watson and his codefendant were tried together with separate juries. Id. at 525. After the state rested its case against Watson, the codefendant presented a witness who testified that Watson was responsible for the crime and that the codefendant was not. Id. at 526. On appeal, the Second District concluded, with little discussion, that “it was error to allow Watson’s jury to remain in the courtroom during the taking of testimony in [the co-defendant’s] case,” and that the witness’s testimony was “extremely prejudicial” to Watson.[8] Id. at 525-26. Similarly, we conclude that it was error to allow Diaz’s jury to be present during the testimony of Rodriguez when Rodriguez presented a defense adverse to Diaz.
The state contends that even if the trial court erred by allowing the Diaz jury to hear Rodriguez testify, the error was harmless. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). To show that the error was harmless, the state must prove “that there is no reasonable possibility that the error contributed to the conviction.” Id.
We cannot find the error to be harmless. Rodriguez accused Diaz of actually murdering Samuel Salomon when the state was barred from eliciting the same evidence. Rodriguez’s testimony likely affected the jury’s determination that Diaz was guilty of the felony murder of Mr. Salomon. Additionally, the jury could have reasonably construed Rodriguez’s testimony as weakening Diaz’s defense in which he argued that the codefendants had fully escaped from the robbery scene before the victim was murdered.
Diaz raises two additional issues, which we affirm without comment.

Affirmed in part; reversed in part; and remanded for new trial.

WARNER and GERBER, JJ., concur.

. Florida Rule of Criminal Procedure 3.152(b) outlines the procedure for severance of defendants.

.Certain principles of felony murder are relevant to this case, and we briefly outline them here:
Section 782.04(2)d, Florida Statutes, [currently section 782.04(l)(a), Florida Statutes,] states that the killing of a human being, which occurs while a defendant is ‘‘engaged in the perpetration of” a robbery is murder in the first degree, or felony murder. The term "in the perpetration of” includes the period of time when a robber is attempting to escape from the scene of the crime. Absent some definitive break in the chain of circumstances beginning with the felony and ending with the killing, the felony, although technically complete, is said to continue to the time of the killing. The State must prove that there was no break in the chain of circumstances beginning with the felony and ending with the murder.
Factors such as the relationship between the underlying felony and the homicide in point of time, place and causal relationship are important in determining whether there was a break in the chain of circumstances. In the case of flight, an important consideration is whether the fleeing felon has reached a place of temporary safety. If the killing is a predictable result of the felonious transaction, neither the passage of time nor separation in space from the felonious act to the killing precludes a felony murder conviction.
Wagner v. State, 921 So.2d 38, 40-41 (Fla. 4th DCA 2006) (citations, quotation marks, and alteration omitted).

. The state abandoned prosecution of count VIII, robbery with a firearm, before the first trial.

. Wagner, 921 So.2d at 41 (citation omitted).

. Rodriguez’s counsel informed the court that Rodriguez intended to testify. During a colloquy with the trial court, Rodriguez confirmed that it was his intent and decision to testify.

. The prosecutor acknowledged that the state had argued Castillo was the actual shooter during the first trial. In some cases, it is "fundamentally unfair” for the state to “argue inconsistent theories of guilt against two co-defendants to the same crime.” State v. Gates, 826 So.2d 1064, 1069 (Fla. 2d DCA 2002).

. In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the U.S. Supreme Court found that the introduction of the statement of a non-testifying codefendant that inculpates the defendant violates the defendant's Confrontation Clause rights, even if the defendant and codefendant were jointly tried. See id. at 127-28, 88 S.Ct. 1620. We note that the holding of Bruton does not itself require a reversal in the instant case because the trial court allowed Diaz to cross-examine Rodriguez.

. In Watson, the Second District ultimately affirmed because Watson’s trial counsel failed to object to the Watson jury hearing the code-fendant’s witness testify, and the court concluded the error was not fundamental. Id. at 526-27. The court noted that Watson "might be able to prove that his counsel was ineffective in failing to request removal of Watson’s jury during [the codefendant’s] case.” Id. at 526.