TAYLOR, J.
Appellant, Matthew Heinly, appeals his conviction and sentence for the first-degree premeditated murder of Timothy Bell. Appellant was indicted for first-degree murder, along with co-defendants Sean Wilson and Pedro Roman. Roman pled guilty and testified against appellant and Wilson at their joint, trial. Although appellant and Wilson were tried together, they had separate juries. Appellant argues that the trial court reversibly erred in denying his request to sever co-defendant Wilson’s cross-examination of Roman and allowing Wilson’s counsel to cross-examine Roman in the presence of appellant’s jury. We agree and reverse for a new trial.
The victim lived in a studio apartment in West Palm Beach. Appellant, Román, Wilson, and Andre Banks were homeless and they periodically slept in the victim’s apartment.
*771 In June 2011, appellant, Roman, and Wilson attacked the victim in his apartment. They tied the victim’s hands and feet, and after kicking, striking, and choking him to death, wrapped his body in trash bags and disposed of it in the apartment’s dumpster. The victim’s body was never recovered.
Several days after the murder, Daniel Rowe, a longtime friend of the victim, became worried because he had not heard from him. He called the victim several times and left messages. Appellant answered the victim’s phone and told Rowe that the victim had tried to commit suicide so they took'him to the hospital. Rowe went by the apartment and saw Wilson and appellant there. He took the victim’s phone for safekeeping. After checking local hospitals and not locating the victim, Rowe returned to the victim’s apartment. He saw Roman there and recovered the victim’s wallet and eyeglasses. Rowe delivered these items to the police and filed a missing person report. He also gave the police leads on people who might have information about the victim’s disappearance. He brought Roman to the police department for him to recount the story he had told Rowe, As a result, appellant, Roman, Wilson, and Banks were arrested and interrogated.

Appellant’s Statement to the Police

Appellant signed a Miranda waiver and gave a videotaped statement to the police. The state later introduced the statement into evidence at trial.
In his statement, appellant said that the victim was suicidal, and that on the day of the murder, he threatened to overdose on prescription medication. Roman suggested that Wilson choke the victim with a wire, so Wilson stood behind the victim and placed a wire around his neck. The ■victim started struggling. Appellant held a pillow over the victim’s face, but he did not press hard so that the victim could still breathe. He said he just wanted to make it look like he was doing something; he was actually trying to help the victim. After the victim, fell off his chair, they stopped their assault. Appellant asked the victim why he wanted to die. Then they all left the apartment.
Later that day, upon returning to the apartment, the defendants discovered that the victim tried to kill himself with gas from the oven. They opened the windows, and. when the victim awoke, he reassured them that he did not want to die. However, Roman told him that once he made a death wish, he had to die. Roman then told Wilson to grab a pipe and choke the victim. Roman threatened the victim with a machete and told appellant to tie him up. Appellant admitted that he provided belts and shoelaces so that Roman and Wilson could bind the victim’s hands and feet. At one point, appellant gave a sock to Wilson to put in thp victim’s mouth. Later, during the interrogation, appellant said that he put the sock in the victim’s mouth and that Wilson tied a belt around his mouth.
When the victim, began struggling, Wilson held the pole tighter against his neck while they hit and kicked him. Appellant held the victim’s bound feet and soon noticed that they were starting to get cold. Wilson continued choking the victim until his eyes rolled backwards and his lips turned black and blue. Appellant claimed that he was high on marijuana and alcohol at the time of the murder and was simply going along with Roman’s directions.
Appellant said that Banks did not get involved until after the victim was dead. Banks was next door at the neighbor’s house during the murder and had previously tried to convince them not to kill the victim. Soon after the victim died, Banks helped Roman and Wilson wrap, the victim’s body in trash bags and a sheet and *772 place him- in the dumpster outside the apartment.
Roman pled guilty' to second-degree murder and was sentenced to forty years in prison; • Banks pled no contest to being an accessory - after the fact and was sentenced to a jail term followed by probation. Appellant and Wilson proceeded to a partially severed trial with separate juries. The court partially severed trial based on appellant’s pre-trial motion asserting a Bruton[1] issue and removed appellant’s jury only during the co-defendant’s opening statement and testimony. The trial court denied. appellant’s request to have his jury removed during Wilson’s cross-examination of Roman.

State’s Direct Examination of Roman

When the state tíalled Roman to testify, appellant’s attorney requested the court remove appellant’s jury from the courtroom while Roman was being cross-examined by co-defendant Wilson’s attorney. Appellant’s attorney explained that his theory of defense and cross-examination strategy were different from Wilson’s and that Wilson’s cross-examination of Roman would be harmful to appellant. The trial court denied appellant’s request to sever the cross-examination, finding that it was untimely and lacked- any legal basis. ■
Roman testified on direct that, on the day of the murder, he tied the victim’s hands and feet with shoe laces. Appellant punched the victim in the chest and kicked him a few times. He also stuffed a sock in the victim’s mouth to keep him from crying out and had Roman tie a belt over the victim’s mouth to hold the sock in place. Wilson held a black pipe, on the victim’s neck, “pushing down and pulling up” at the same time for ten to fifteen minutes. After the victim died, Wilson wrapped him in a sheet and trash bags. They disposed of the body in the dumpster. Wilson covered the body with branches and pieces of cardboard.
Before Roman was cross-examined by co-defendant Wilson’s attorney, appellant renewed his motion to sever and again objected to having his jury present during Roman’s cross-examination. The court overruled his objection.

Co-Defendant Wilson’s Cross-examination of Roman

During Wilson’s cross-examination, Roman testified that Banks was also present on the night of the murder. He said that it was Banks’s idea to kill the victim. Banks struck the victim in the throat and pressed against his stomach with a machete, He was also the one who told Wilson to grab the pipe. When it appeared that Wilson was not applying sufficient pressure to the victim’s throat with the pipe, Banks used his foot to crush the pipe down on the victim’s neck. Roman said they were all following Banks’s commands.
Roman testified that he was afraid of Banks, so he initially lied to law enforcement about Banks’s involvement. Banks had threatened Roman and told him to lie about Banks’s involvement in the murder.
Both during and after Wilson’s cross-examination of Roman, the trial court held bench conferences concerning appellant’s request for severance. Defense counsel stressed that severance was necessary for appellant to receive a fair trial. The court, however, determined that Wilson’s attorney actually brought out matters favorable to appellant during his cross-examination *773 of Roman and concluded that a removal of appellant’s jury was not necessary to achieve a fair determination.

Appellant’s Cross-examination of Roman

During appellant’s cross-examination of Roman, Roman testified consistent with appellant’s theory that the victim’s death resulted from a prank gone wrong. Roman testified that the victim’s death was an accident. He said that, earlier that day, the victim tried to kill himself with pills and with gas and that they were trying to scare him. He said Wilson pretended to choke the victim with a wire in order to teach him a lesson. Roman believed that choking the victim with a wire was a prank because Wilson laughed after: wards. Later that day, Roman heard Banks and appellant say that they wanted to play another prank on the victim. Roman thought that tying the victim up and pretending to choke him with a pipe was another prank. He was surprised when the victim died.
On redirect, Roman testified that Banks went back and forth from the victim’s apartment to the neighboring apartment. He tried to distract the neighbor during the killing. Once, when Banks returned to the victim’s apartment and checked his pulse, he told the men to continue choking the victim because he was still alive. Roman claims that he, appellant, and Wilson were confused by that command because they thought they were only trying to scare the victim. At that point, Banks stomped down on the pipe and told Wilson how hard he should choke the victim. Banks also told them how to dispose of the body.
The state impeached Roman with an earlier statement to the police. In that statement, Roman told the police that it was appellant’s idea to kill the victim because he hated the victim. He explained that he told police that it was appellant’s idea because Banks told him what to say.
Roman clarified that Banks was not in the room when he handed the sock to appellant to put in the victim’s mouth. Banks was not in the room when Wilson stabilized himself against the wall so that he could leverage strength to choke the victim. However, he was in the room when appellant was kicking the victim. After Roman’s testimony, the state rested its case. Wilson’s attorney moved for a judgment of acquittal on the ground that the state failed to prove a prima facie case of premeditated murder. Appellant’s attorney joined in the motion. The court denied both motions.

Appellant’s Testimony

Appellant testified in his defense. He admitted that he had been convicted of four felonies. He said that the victim’s death was a prank gone wrong. On the day of the murder, the victim threatened to kill himself. Wilson pulled a prank on the victim and pretended to choke him with a wire. Appellant put a pillow over his face to show him what it would feel like to suffocate.. Later that evening, appellant, Wilson, Roman, and Banks decided to play another prank on the victim. When they returned to the apartment, they realized that the victim had tried to kill himself with gas. Appellant and Roman wrestled with the victim and then, appellant began hitting him. They tied him up and Wilson began choking him with a black metal pipe. Appellant held the victim’s feet until they turned cold.
Banks came in and checked the victim’s pulse. The victim was still alive so Banks put his foot down on the pipe. Appellant told Banks to stop but he did not. When they realized that the victim was dead, they started freaking out. Banks and Roman wrapped the victim in trash bags and *774 sheets. Wilson helped them put the body in the dumpster.
. On cross-examination, appellant admitted that he never told the police that they were playing a prank. He said he was scared during the interview.- Appellant also admitted that Wilson, Roman, and Banks had previous conversations about killing the -victim, but he thought. they were joking.
After appellant’s testimony, the defense rested. The jury' found appellant guilty as charged, and the court sentenced him to life in prison.
On appeal, appellant argues that the trial court’s failure to sever the juries during the co-defendant’s cross-examination of the state’s key witness, Roman, violated his due process rights and denied him a fair trial. Specifically, appellant argues that the co-defendant’s cross-examination of Roman conflicted with his theory of defense and caused him extreme prejudice. Appellant proceeded on the theory that the victim’s murder was a prank gone wrong and that he, Roman, and Wilson were only trying to scare the victim because of his prior suicide attempts. He anticipated that Roman would testify that the incident was all a prank and he depended on Roman’s credibility.
However, during Roman’s cross-examination by the co-defendant, Roman testified that he lied during his direct examination. He said that another individual, Andre Banks, was present during the incident and that Banks directed the defendants to kill the victim. Both appellant and Roman had previously stated that Banks came in after the fact and only helped to discard the victim’s body. Roman’s testimony during Wilson’s cross-examination thus damaged appellant’s theory of defense and undermined Roman’s credibility.
In cases with joint co-defendants, the trial court “shall” order severance during trial, with the defendant’s consent, “on a showing that, the order is necessary to achieve a fair determination of the guilt or innocence of 1 or more defendants.” Fla. R. Crim. P. 3.152(b)(1)(B). The decision whether to sever is determined on a case-by-case basis. McCray v. State, 416 So.2d 804, 806 (Fla.1982). “Whéther the trial court erred in denying appellant’s motion to sever is reviewed for ah abuse of discretion.” Rodriguez v. State, 909 So.2d 547, 549 (Fla. 4th DCA 2005).
Here, appellant requested severance under Rule 3.152(b)(1)(B). He argues that he suffered extreme prejudice when the trial court denied his request to sever co-defendant cross-examination of Roman.
Although courts are allowed to use multiple juries as a tool for furthering judicial economy, they have been cautioned that “a trial judge must take great care to insure that each jury hears evidence relevant only to its defendant.” Watson v. State, 633 So.2d 525, 525 (Fla. 2d DCA 1994). In Watson, for example, the Second District concluded that “it was error to -allow Watson’s jury to remain in the courtroom during the taking of testimony in [his co-defendant’s] case” where the testimony exculpated his co-defendant and inculpated him. Id.
Similarly, in Estevez v. State, 127 So.3d 635 (Fla. 4th DCA 2013), we held that the trial court reversibly erred in allowing the co-defendant, Rodriguez, to testify in the presence of Estevez’s jury that Estevez committed crimes for which' Estevez had been acquitted in an earlier trial. Quoting the Court of Appeals of New Mexico, we cautioned trial courts of the potential for error in dual-jury trials:
[W]e caution trial courts to bear in mind that the dual-jury procedure has the *775 potential for engendering error, especially in complex cases,. and requires .great diligence, on the part of the trial judge and cooperation of the attorneys to take the precautions necessary to ensure due process throughout the joint trial.
Id. at 642 (quoting State v. Padilla, 125 N.M. 665, 670, 964 P.2d 829, 834 (Ct.App. 1998)).
Here, the trial court revisited appellant’s request to sever his jury during Roman’s cross-examination several times, but it failed to fully grasp the prejudicial impact of Roman’s testimony on appellant’s defense. Until Wilson’s cross-examination of Roman, appellant’s jury had not heard of Banks’s involvement in the murder. In appellant’s statement to the police and in the state’s opening and direct examination of Roman, there was no mention of Banks’s presence during the murder. Up to this point, the evidence supported appellant’s defense that this was all a tragic accident which started as a prank involving only appellant, Roman, and Wilson. In fact, Banks was charged only as an accessory after the fact.
Then, because of Wilson’s cross-examination of Roman, the accidental homicide suddenly became an intentional murder at the direction of Banks. This severely damaged appellant’s defense that the homicide was unintentional and interjected evidence to justify appellant’s conviction for first-degree murder. Had appellant’s jury been excluded from the courtroom during Wilson’s cross-examination of Roman, appellant would not have needed to respond to this new evidence and information that was elicited for the first time at trial. Further, this new evidence negatively impacted the credibility of Roman, upon whom appellant was relying for his defense.
Due to the prejudicial impact of this evidence elicited on cross, the trial court should have simply dismissed appellant’s jury during the co-defendant’s cross-examination, as the court did during other portions of the trial. The jury was unable to render a fair determination of appellant’s guilt due to the prejudice appellant suffered as a result of this cross-examination. We thus conclude that the trial court abused its discretion in denying appellant’s motion to sever co-defendant Wilson’s cross-examination of Roman and reverse and remand for a new trial. .

Reversed and Remanded.

WARNER and GERBER, JJ., concur.

.. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission of co-defendant’s confession that implicated defendant at joint trial constituted prejudicial error even though trial court instructed, the jury that the statement could only be used against co-defendant and must be disregarded with respect to defendant).